THE STATE ex rel. WILLIAM C. REYNOLDS et al. v. HENRY L. JOST et al.

**In Banc, April 12, 1915.**

1. COMMISSIONER'S FINDING OF FACTS: Assignment of Exceptions. There are no statutory regulations of the powers and duties of a commissioner appointed by the Supreme Court to take evidence and report his findings in a mandamus case originally brought in said court; and while a formal assignment of exceptions to his finding of facts would be the better

practice, in that said exceptions would serve to fix the lines of argument, a failure to make such an assignment will not preclude the court from considering all the facts.

2. **METROPOLITAN POLICE SYSTEM: Power of State Over.** The State can, by statute, provide for a metropolitan police force for its cities, and compel them to pay the expenses thereof by appropriations out of the city's revenues. [Following State ex rel. v. Mason, 153 Mo. 23.]

3. ———: ———: **Preservation of Public Peace.** The principle underlying the metropolitan police system is that the first and highest duty of the State is to preserve the public peace, and that is a State duty which extends and embraces every part, division, and subdivision of the State, is a governmental duty which devolves upon the State and not upon its municipalities any further than the State in its sovereignty may see fit to impose it upon or delegate it to them, and a police board established by the State in such cities pursuant to statutes, and the officers chosen by it, are State officers; and the same power that gives to a city municipal incorporation and authority to levy taxes and raise revenue can say to it that it must use a designated portion of that revenue to maintain the public peace, not only for the benefit of those within its borders, but for those other citizens who reside elsewhere.

4. ———: **Inconsistent Freeholders' Charter.** The charter of Kansas City is subject to the laws of the State in all matters of State concern, and if there is a conflict between the charter provisions and the statutes the charter provisions are to that extent void. The metropolitan police system is not a matter of local self-government, but both the board and officers are State officers, and the statute creating the system is but the exercise of the police power of the sovereign State.

5. ———: ———: **Antedating Charter.** And it makes no difference that the State law antedates the city charter.

6. ———: **Definite Number of Policemen.** The utmost limit of policemen in Kansas City under the statute is one patrolman for every 700 inhabitants, and everything about the system, including salaries, is definite, except the manner of determining the population, which is to be ascertained "from the best known source for obtaining such information," and except the number of police districts, and to add one district would be to add only one captain, one lieutenant and four sergeants, but no more patrolmen. The act has no more flexibility than seems reasonable.

7. ———: **Ascertaining Population.** Where the statute fixes upon the number of patrolmen as its basis for the number of other

officers and says the number of patrolmen for the city must not exceed "one for every seven hundred inhabitants, the estimate to be taken from the best known source for obtaining such information," the board of a growing city in arriving at its population, is not shut up to the last United States census, but may use the best means available for ascertaining as nearly as possible the number of inhabitants—the last school enumeration, the last election returns, the number of users of city water, etc.

8. ————: Amount of Appropriation: Demand Disproportionate to Revenue. Where the board of a metropolitan police system has made a demand for an amount of money fully authorized by the statute and admitted to be needed, and the only objection by the city to appropriating such amount is that it is so disproportionately large that, if all of it is appropriated, other departments of the city government will be crippled, the city must yield, and appropriate the amount demanded; for, if the board has exercised its statutory discretion within the limits fixed by the law it cannot be disturbed, and if the amount is unreasonable it is the fault of the statute authorizing it, and the statute cannot be declared invalid on the ground that in the opinion of the court it requires an unreasonable appropriation.

9. ————: ————: ————: Unreasonable Law: Number of Inhabitants. The law which fixes the number of policemen at one patrolman for every seven hundred inhabitants, and fixes their salaries, and requires the Board of Police Commissioners to estimate the population from the best information obtainable, may be unreasonable in the estimation of the court, but its reasonableness was a question for the Legislature; and if the board exercised its discretion in ascertaining the number of inhabitants in good faith and clearly within its statutory power, and thereby increased the number of patrolmen, and hence the demand for a larger appropriation, its acts cannot be questioned, and the court cannot say that the amount demanded is unreasonable, nor deny its writ of mandamus compelling an appropriation of the amount demanded by the board.

Held, by WOODSON, C. J., concurring in part and dissenting in part, that the city revenues should not be so apportioned as to cripple either the police department or the other departments of the city government, and the appropriations should be made according to the needs of each equitably, and if there is not enough revenue to sustain all city departments then the Board of Police Commissioners should not be permitted to demand an amount so large as to cripple the other departments, and when the city council has made an appropriation for the police department which is not an unjust discrimination against it, mandamus should not go to compel a larger one.

Mandamus.

WRIT ISSUED.

*Robinson & Goodrich* and *Willard P. Hall* for relators.

(1) The findings of fact made by the commissioner are binding upon both relators and respondents because no exceptions have been filed to his report by either. So far as we know, no rule has been established by this court upon this subject, but this is the rule that prevails generally in all cases referred by courts to masters, referees and commissioners, and no reason is apparent why it should not apply in this court to findings of fact made in the reports of its commissioners (certainly the practice is for those objecting to such findings to file exceptions thereto). (2) The evidence reported by the commissioner fully sustains all those findings of fact by him that are necessary to support relators' theory of this case. (3) The evidence fully sustains the commissioner's finding that the sum of $650,000 was reasonable and necessary for relators' uses during the present fiscal year. (4) The commissioner's findings that the departments of the city need the sums apportioned to them and that the sum of $650,000 could not be appropriated to relators' uses without compelling some of said departments to shut down are inaccurate and overdrawn. (5) The police department of Kansas City is a State agency, not a city department. The duty imposed upon respondents to appropriate money for said department is imposed upon them as agents of the State and not as officers of the city, and the statutes in this regard are not unconstitutional in that they deprived the city of any constitutional right to self-government or home rule. Goodnow's Municipal Home Rule, pp. 8-11, 15, 37, 39, 80, 85, 95, 101-103, 107, 108, 111, 207, 208, 221-232. The preservation of the public peace by the es-

tablishment, regulation and government of a police department for any part of the State is a governmental and not a municipal matter. The power to do this is governmental and not municipal. State ex rel. v. Mason, 153 Mo. 23; State v. Stobie, 194 Mo. 14; State ex rel. v. County Court, 34 Mo. 546; Baltimore v. Board of Police, 15 Md. 376; People v. Draper, 15 N. Y. 532; State v. Covington, 29 Ohio St. 111; State v. Baughman, 38 Ohio St. 455; Americus v. Perry, 114 Ga. 871; State v. Hunter, 38 Kan. 578; Commonwealth v. Plaister, 148 Mass. 375; Redall v. Moores, 63 Neb. 219; State v. Nolan, 71 Neb. 136; Gooch v. Exeter, 70 N. H. 413; Newport v. Horton, 22 R. I. 201; Horton v. Newport, 27 R. I. 283; Burch v. Hardwicke, 30 Gratt. (Va.) 24; Ingersoll on Public Corp., secs. 64 and 65; People ex rel. v. Mahoney, 13 Mich. 481; 1 Dillon on Mun. Corp. (5 Ed.), sec. 97; Cooley on Taxation (2 Ed.), p. 681; Goodnow on Municipal Home Rule, pp. 134, 208, 224, 239; Ingersoll on Public Corporations, sec. 64; 28 Cyc. 486; 20 Am. & Eng. Ency. Law (2 Ed.), 1223. The general rule is that a State tax must be levied upon the property of the whole State, because, as a general rule, the taxing district for State taxes embraces the whole State. 1 Cooley on Taxation (3 Ed.), 225-233. But there are taxes which are levied for State purposes in the sense that the State is generally interested therein, but which purposes are of so much local concern as to make them of peculiar benefit to the locality to such an extent as to justify levying the taxes exclusively against the local property. Instances of this sort are taxes levied for road and bridge purposes (1 Cooley on Tax., 1297), for the construction of courthouses and for police purposes, in the narrow sense of preserving the public peace (Id., p. 1296). Such taxes are State taxes. They could be imposed upon the whole State, but they may be also imposed upon the particular locality. State ex rel. v. Field, 119 Mo. 593; Hamilton v. County Court, 15 Mo. 1; State ex rel. v.

County Court, 34 Mo. 546; State ex rel. v. Mason, 153 Mo. 23; Elting v. Hickman, 172 Mo. 237; Young v. Kansas City, 152 Mo. 661; Davock v. Moore, 105 Mich. 120; Kirby v. Shaw, 18 Pa. St. 258; Philadelphia v. Field, 58 Pa. St. 320; Gordon v. Carnes, 47 N. Y. 608; Mayor v. Howard, 15 Md. 397; Talbot County v. Queen Ann County, 50 Md. 245; Goodnow on Municipal Corporations, p. 103. (6) The Legislature had the power to and it did make the estimate by the police board of the money needed by it conclusive upon respondents. It was not for respondents to question the correctness of the estimate or the needs of the police board. It was no answer to said estimate for respondents to say that they had the money, but could not appropriate it because the departments of the city government needed some of it. The statute makes the needs of the police board paramount to the needs of the city. Sec. 9778, R. S. 1909; State ex rel. v. Commissioners, 107 N. C. 110; State ex rel. v. Mason, 153 Mo. 58; St. Louis v. Shields, 52 Mo. 350; Kirby v. Shaw, 18 Pa. St. 258. (7) The proper remedy to compel the mayor and common council to appropriate the amount of the estimate made by relators was by mandamus. There was no other remedy. 19 Am. & Eng. Ency. Law, 864; State v. Shakespeare, 41 La. Ann. 156; Perkins v. Slack, 86 Pa. St. 270; Bridge Comrs. v. Philadelphia, 7 Phila. (Pa.) 298, 3 Brews. (Pa.) 596; State v. Merrillon, 24 Ohio Cir. Ct. 249; State v. Jersey Bd. of Finance, 53 N. J. L. 62; State ex rel. v. Mason, 153 Mo. 55; High on Extra. Remedies (3 Ed.), 324. (8) Respondents have all along appeared to assume that the appropriation for the uses of the police department necessarily reduced the revenues of the city applicable to the uses of the city. In this they erred. Respondents could have levied a specific tax for police purposes, and this could not have been included in city taxes for the purpose of determining whether the rate for city purposes exceeded the constitutional limit. Commonwealth v. Commrs.,

37 Pa. St. 277; Commonwealth v. Perkins, 43 Pa. St. 400; State ex rel. v. Field, 119 Mo. 613; State v. Street, 117 Ala. 203; Hamilton v. County Court, 15 Mo. 1; State ex rel. v. County Court, 34 Mo. 546; St. Louis v. Shields, 52 Mo. 351; Mayor v. Guthrie ex rel., 1 Okla. 188; Hare v. Kennedy, 83 Ala. 608; Gilkerson v. Federal Justices, 13 Gratt. 577; Douglass v. Harrisville, 9 W. Va. 165; Powell v. Parksburg, 28 W. Va. 706; Norfolk v. Ellis, 26 Gratt. 226; Eyre v. Jacob, 14 Gratt. 434; Norfolk v. Chamberlain, 89 Va. 202, 37 Cyc. 734. (9) The statutes do not delegate to the police board any of the Legislature's legislative powers. Respondents' counsel object because section 9787 fixes only the maximum number of men in the different classes of the service and leaves it to the discretion of the police board to fix the number within that maximum. A like objection was made for St. Louis in the Mason case, 153 Mo. 47, but the objection made there was that the St. Louis statute fixed a minimum and left the maximum to the discretion of the police board. This court met the objection by treating the minimum as the maximum. All seemed to concede that if a maximum had been fixed by the statute it would have been all right. Doubtless it was due to the result of the Mason case that the writer of the statute herein involved fixed a maximum. (10) That the population of Kansas City was 275,000 on April 20, 1914, is not open to question. The police board estimated the population at that number under the power of the statutes and their action in that behalf is final and conclusive. The last Federal census has nothing to do with the matter. 1 Dillon, sec. 153; State v. Dist. Court, 84 Minn. 377; Dunne v. Railroad, 131 Mo. 1; People v. Pope, 6 Utah, 353.

*Henry L. Jost, Andrew F. Evans* and *A. F. Smith* for respondents.

(1) The case of State ex rel. v. Mason, 153 Mo. 23, so confidently relied upon by relators in this case, is

not, in our judgment, a precedent for the determination of this case, or an obstacle in the way of a decision of this case in favor of respondents. (a) Because of essential differences in the provisions of the statute relating to St. Louis, under which the Mason case was decided, and the statute relating to Kansas City, under which this proceeding is prosecuted. (b) Because of essential differences between the relations St. Louis, a political subdivision of the State, bears to the State, and the relations which Kansas City, not a political subdivision of the State, bears to the State. (c) Kansas City does not owe its existence to legislative enactment, but to authority conferred by the Constitution upon the people of this locality. It does not levy its t : for municipal purposes by authority of the Legislature, but by authority of the Constitution. The Legislature may not take away a right conferred upon the people by the Constitution. If it may say that taxes levied and collected by the city, under the authority of the Constitution, for municipal purposes, shall not be expended for municipal purposes, but shall be expended for State purposes or for other purposes not municipal, then it seems to follow that the Legislature may also say that Kansas City shall not levy any tax for municipal purposes in excess of seventy cents, for instance, on the one hundred dollars, or any tax at all, for municipal purposes, and thereby nullify, absolutely, the provisions of the Constitution. (d) There are, in fact, a number of essential differences between the statute applicable to St. Louis (Secs. 9802 et seq., R. S. 1909) and the statute applicable to Kansas City (Secs. 9764 et seq., R. S. 1909). By section 9806, the police commissioners of St. Louis are required, without discretion, to employ a specific number of policemen. By section 9787, R. S. 1909, the police commissioners of Kansas City "may, as the service requires, appoint" not a specified number of policemen, but "as the service requires," in their discretion, officers and police-

men. As will be seen later on, the number of police districts into which Kansas City shall be divided is not specified by the statute, whereas the number into which St. Louis shall be divided is specified by statute. In Kansas City the police commissioners may create as many police districts as they see fit, and by section 9787 appoint not more than one captain nor more than one lieutenant, nor more than four sergeants, for each police district; and may also appoint not more than one detective sergeant for each fifteen detectives; police detectives not to exceed one for every fifteen patrolmen, and patrolmen not to exceed one for every seven hundred inhabitants, "the estimate to be taken from the best known sources for obtaining such information." In St. Louis they are required by section 9807 to appoint fourteen captains, fourteen lieutenants and 130 sergeants; and by section 9806 they are required to appoint 1250 patrolmen and 150 probationary patrolmen; not less than twenty-five detectives, etc. The number of each class of employees is definitely prescribed by the statute. By section 9811, the police commissioners of St. Louis are required to divide the city into twelve police districts. In Kansas City, by section 9798, the police commissioners are given power "to divide the city into police districts." The number of districts is not specified. The discretion of the police commissioners is unbridled. As above stated, the number of officers which they may appoint may be determined by the number of districts into which they see fit to divide the city. In St. Louis the police commissioners are required by section 9813, to make annually on the 31st day of March of each year, in writing, an estimate of the sums of money which will be necessary for the current fiscal year, to enable them to discharge their duties, and certify the same to the Municipal Assembly. In Kansas City the commissioners are required, by section 9778, to estimate what sum will be necessary for the ensuing fiscal year to enable them

to discharge their duties, and the common council is required, in the first apportionment ordinance of that fiscal year, to set apart the amount so required, "payable out of the next annual revenues of the city." (2) Kansas City, like St. Louis, exists under a special charter, by authority of the Constitution—not by legislative enactment. Under the rights conferred by section 16, article 9, of the Constitution, the people of Kansas City, at an election held April 8, 1889, adopted a special charter which went into effect May 9, 1889. Since that date, Kansas City has continued to exist under its own charters. Its present charter was adopted at an election held August 4, 1908, and went into effect September 4, 1908. The Supreme Court and Courts of Appeals of this State have declared and upheld the rights of the people in Kansas City and St. Louis to local self-government, under the Constitution of the State, in many cases, among which are the following: State ex rel. v. Field, 99 Mo. 352; Murnane v. St. Louis, 123 Mo. 479; Kansas City ex rel. v. Scarritt, 127 Mo. 642; Kansas City v. Ward, 134 Mo. 172; Kansas City v. Marsh Oil Co., 140 Mo. 458; St. Louis v. Dorr, 145 Mo. 466; Stevens v. Kansas City, 146 Mo. 460; Kansas City v. Bacon, 147 Mo. 259; Kansas City v. Mastin, 169 Mo. 80; Meier v. St. Louis, 180 Mo. 391; Morrow v. Kansas City, 186 Mo. 675; St. Louis v. Liessing, 190 Mo. 464; Jaicks v. Merrill, 201 Mo. 91; St. Louis v. De Lassus, 205 Mo. 578; Brunn v. Kansas City, 216 Mo. 108; Stanton v. Thompson, 234 Mo. 7; Gregory v. Kansas City, 244 Mo. 523; State ex rel. v. Seehorn, 246 Mo. 541; Paving Co. v. Hayward, 248 Mo. 280; Paving Co. v. Meservey, 103 Mo. App. 186; Kansas City v. Woerishoeffer, 249 Mo. 1; Tobacco Co. v. St. Louis, 247 Mo. 374. (3) The power of Kansas City to levy taxes for municipal purposes is given by the Constitution and not by legislative enactment. Constitution, art. 10, sec. 1; St. Louis v. Sternberg, 69 Mo. 289; St. Louis v. Bircher, 76 Mo. 431; United States v. New Orleans, 98

U. S. 381; Security Co. v. Hinton, 97 Cal. 218; Ex parte Braun, 141 Cal. 204. (4) Limitations on power of Kansas City to levy taxes for municipal purposes, and on power of Legislature to authorize the city to levy taxes for any other purposes. Sec. 11, art. 10, Constitution; Brooks v. Schultz, 178 Mo. 222; Trust Co. v. Pagenstetcher, 221 Mo. 121; Commrs. v. Peter, 253 Mo. 520; Cooley on Taxation (3 Ed.), p. 469; 5 McQuillin, Mun. Corp., sec. 2360; Taylor v. Smith, 50 N. J. L. 101; 37 Cyc. 724. (5) St. Louis is a political subdivision of the State; Kansas City is not. St. Louis may be required by the State to render to it any duty which the State may require a county to render. State ex rel. v. Rebenack, 135 Mo. 350; St. Louis v. Dorr, 145 Mo. 479; State ex rel. v. Walsh, 69 Mo. 408. (6) Kansas City has no power to levy a "State tax" for its own use or for the use of the State. The Legislature has no power to authorize Kansas City to levy such a tax and has never undertaken to do so. Secs. 1, 8, 16, 17, 19, art. 10, Constitution; R. S. 1909, secs. 11348, 11416, 11473, 11475, 11832; Cooley's Const. Lim. (5 Ed.), p. 250. (7) The power of taxation is a sovereign power which can be exercised by a legislative authority only. Park v. County Commissioners, 61 Fed. 436; Hovey v. Commissioners, 56 Kan. 577; Commissioners v. Abbott, 52 Kan. 148; Vallelly v. Park Commissioners, 16 N. D. 25; Gage v. Graham, 57 Ill. 144; Heinze v. People ex rel., 92 Ill. 406; James v. United States Co., 133 Ky. 299; State ex rel. v. Ashbrook, 154 Mo. 375; People ex rel. v. Chicago, 51 Ill. 17; State ex rel. v. Des Moines, 103 Iowa, 76, 39 L. R. A. 389; Thompson v. Schermerhorn, 6 N. Y. 92; Davis v. Read, 65 N. Y. 566; Houghton v. Austin, 47 Cal. 646; State ex rel. v. Koster, 38 N. J. L. 308; St. Louis to use v. Clemons, 52 Mo. 133; Porter v. Railroad, 76 Ill. 561. The State cannot confer upon a board or officer the discretionary power to incur or create an indebtedness, because that power

carries with it the power of such board or officer to impose a tax to meet such indebtedness. Van Cleve v. Commissioners, 71 N. J. L. 574; Bernards Township v. Allen, 61 N. J. L. 228. (8) A statute which would authorize a board of police to compel Kansas City to pay for the maintenance of a police department an amount which would prevent the city's properly maintaining its government would be oppressive and void. The statute is oppressively enforced by the police commissioners' wrongfully fixing the population of Kansas City. An ill-taken census furnishes no evidence. State ex rel. v. Wooten, 139 Mo. App. 221; State ex rel. v. Wilder, 211 Mo. 305. Population cannot be determined, like any other fact, by evidence; it refers to an official census. In re Assessment, 54 N. J. L. 156. (9) The police officers of Kansas City have more of the attributes of municipal than of State officers, and the city should have a voice in the maintenance of the department. 5 McQuillin, Mun. Corp., sec. 2418; 1 McQuillin, Mun. Corp., sec. 181. (10) This court has the discretionary right to refuse a writ of mandamus where the enforcement of it would do more harm than good. 24 Cyc. 136, 168; Evans v. Thomas, 32 Kan. 459; State ex rel. v. Shelden, 53 Neb. 365; Effingham v. Hamilton, 68 Miss. 522; Merrill on Mandamus, sec. 66; Clay County v. McAleer, 115 U. S. 616; State ex rel. v. County Court, 68 Mo. 29; Cromartie v. Commrs., 86 N. C. 216; Supervisors v. People ex rel., 222 Ill. 9; State ex rel. v. City Council, 87 Minn. 156.

GRAVES, J.—Original action in mandamus. Relators constitute the majority of the Board of Police Commissioners of Kansas City, acting as and for such board. The respondents are the mayor and members of the common council of said city.

Before the beginning of the fiscal year of 1914 the Board of Police Commissioners certified to the mayor and common council the amount that would be re-

quired to maintain the police force and the police department of the city. This estimate was $725,000. The mayor urged that such sum could not be appropriated, and the Board of Police Commissioners cut out some items and finally made their demand for $650,000. The first demand included the following items:

"For the cost of the department as now organized:

| | |
|---|---:|
| Salaries .......................$445,120.00 | |
| For the cost of maintenance, repairs, rents, provisions, materials, supplies and incidental expenses .... | 61,763.83 |
| For the cost of the proposed increase in the number of policemen necessary for the discharge of the duties imposed upon and entrusted to the Board of Police Commissioners as authorized by the statutes ................... | 158,760.00 |
| Renting of apparatus for police alarms, fire alarms, or for the purchase of new or additional equipment, arms or other apparatus .. | 43,336.17 |
| Necessary repairs, repainting and overhauling of stations ......... | 16,000.00 |
| Total ...................$724,980.00" | |

As modified, by cutting out, the demand stood:
"For the cost of the Department as now organized:

| | |
|---|---:|
| Salaries .......................$445,120.00 | |
| For the cost of maintenance, repairs, rents, provisions, materials, supplies and incidentals ........... | 36,120.00 |

For the cost of proposed increase in the number of policemen necessary for the discharge of the du-

ties imposed upon and entrusted
to the Board of Police Commis-
sioners as authorized by statute. . 168,760.00

$650,000.00''

The petition for our writ averred that the re-
spondents refused to appropriate more than $500,000
for the police department of such city, and prayed for
our writ of mandamus to compel the respondents to
appropriate the full amount of $650,000. Our alter-
native writ was issued and respondents made return
thereto. This return, as amended, would seem (1) to
challenge the right of relators to make a valid demand
at all, and (2) that if they had such right the demand
made was unreasonable, and respondents were there-
fore justified in refusing it. The return is quite lengthy,
but when the admissions made therein are taken
with the other matters pleaded, the foregoing is the
substance thereof. If other matters pleaded become
necessary they can and will be noted in the course
of the opinion.

Relators base their authority in the premises upon
section 9778, Revised Statutes 1909, which reads:

"It shall be the duty of the board of police at
the beginning of each fiscal year to estimate what sum
of money will be necessary for the ensuing fiscal year
to enable them to discharge the duties hereby imposed
upon or entrusted to them, and they shall forthwith
certify the same to the common council or municipal
assembly of the city, who are hereby required in the
first apportionment ordinance of that fiscal year to set
apart and appropriate the amount so required, pay-
able out of the next annual revenue of the city. If the
board shall be required to call out an extra police force
and the expense thereof shall not have been contem-
plated in their first estimate, they shall immediately
certify the expense of such additional force, and the
additional amounts so required shall be appropriated

for that purpose. The estimate made at the beginning of each fiscal year shall embrace the cost of the department as then organized, the cost of any proposed increase in the number of policemen necessary for the discharge of such duties and authorized hereunder, and the cost of any proposed erection of station houses, the renting of apparatus for police alarms, fire alarms, or the purchase of new or additional equipment of arms or other apparatus. The term common council, as used in any provision hereof, shall be construed to mean the municipal assembly or other body having legislative authority in such city.''

Respondents seek to hide behind the powers which they claim to be granted to them by the city charter adopted under the provisions of section 16, article 9, of the Constitution.

The two questions suggested, supra, are at least, the two vital questions. There are other minor questions, which can be best stated in connection with the points made. This sufficiently outlines the case.

I. It is urged by relators that as no formal assignment of exceptions was made to our commissioner's finding of facts, the respondents and this court is bound by such findings. In this rela-

**Commissioner's Findings: Assignment of Exceptions.** tors are in error. We have no statutory regulations as to the powers and duties of the commissioner appointed by this court in cases of this kind. We usually prescribe his duties by an order made at the time. Sometimes we direct him to make findings both as to the facts and the law. At other times we limit his work to the findings of facts alone. We always require him to not only take, but to report the testimony to this court. There would be no necessity of reporting the testimony if we were going to be bound by the commissioner's finding of fact. It could, of course, be

265Mo.5

argued that we would have to have the evidence in event there were exceptions filed to his findings of facts. But we neither have a statute nor a rule of court fixing this practice. We have therefore provided for no exceptions. These cases are usually cases of vast importance, and we would be loth to permit a commissioner—a mere arm of the court—to cut off a full investigation of either the facts or law of the case. The better rule, and one which we have usually followed, is that the findings of facts made by our commissioner is merely advisory, but in no sense binding upon us. We have reserved and should reserve the unrestricted right to reach our own conclusions as to the facts, and with a free hand apply our views of the law. We have, at times, required our commissioner to report to us his conclusions of law, but we have never deemed such conclusions as binding upon the court. They are advisory merely. So likewise should be the findings as to facts. The court is the body which is responsible for the final disposition of these very important cases, and we do not feel like announcing any rule which would, in any sense, restrict a full examination of the facts by the court, either upon a suggestion of a party to the suit, or upon our own motion. It would follow that we should go into the facts when challenged, whether formal exceptions were filed before argument or not. The better practice for the lawyers in the case would be to formally point out by exceptions what findings were challenged, and in this way the scope of the case might be more compact upon the argument. Whether this be done or not, the court should reserve to itself the right to go to the entire record for the facts. This view disposes of relators' contention contrary to their ideas.

II. Whilst we have reserved the right to go into the record, and find the facts contrary to the findings made by the commissioner, yet our examination of this

record discloses that our learned commissioner has not only been fair, but he has been exceedingly careful and painstaking in making his findings of facts. We shall note the more serious objections made to his findings, as it becomes necessary to use the particular findings of fact in the further course of this opinion. If such particular finding does not accord with the evidence, we shall so state.

III. The importance of this case is apparent from the statement made, supra. The life of the metropolitan police system of Kansas City is at least at stake,

**Metropolitan Police System.**

if not more. In fact it might well be said that the metropolitan police systems of the State are involved, because if some of the contentions of respondents be good, there is no such thing as a metropolitan police system. In other words, if the State has the mere control of the police body, with the power left in the municipality to starve the police force to death by refusing to appropriate funds for its support, then there can be no metropolitan police force. The municipality, the creature of the State, can rise up against the State and kill any metropolitan police force which the State may establish. No set of officers can or will serve without pay, and if the pay of a metropolitan police system is left to the caprice of a municipal government, ofttimes at war with the State government, there can be no effective police force under State control. The question is therefore a vital one to the State. The first questions are: (1) Can the State establish a police system for one of its municipal creatures, and compel that creature to properly sustain such police system out of the funds gathered for municipal purposes; and (2) if it can, is the demand made by the relators in this case within the State power, under the law it has enacted, supra? These questions we take in their order.

IV.   The brief of counsel for respondents attacks the validity of the statutes relied upon by relators, i. e., section 9778, Revised Statutes 1909, and other sections relative to the metropolitan police system established for Kansas City. That the State can establish in a municipality a metropolitan police force, and require such municipality to pay for the same, has been thoroughly and well settled by the lamented Judge GANTT in a very able opinion in the case of State ex rel. v. Mason, 153 Mo. 23.   The doctrine announced is a trite one, i. e., the creature is not greater than its creator.   In that case GANTT, C. J., said:

**Power of State Over City Revenues.**

"The fundamental principles underlying the Acts of 1861 and 1899, creating boards of police commissioners for the city of St. Louis, are the same, and the constitutionality of such legislation has stood the test of the most critical judicial examination and review. Laws like these and those of other states providing a metropolitan police system for large cities, are based upon the elementary propositions that the protection of life, liberty and property and the preservation of the public peace and order in every part, division and sub-division of the State, is a governmental duty which devolves upon the State and not upon its municipalities any further than the State in its sovereignty may see fit to impose upon or delegate it to the municipalities. The right to establish the peace and order of society is an inherent attribute of government, whatever its form, and is co-extensive with the geographical limits thereof, and touching every part of its territory.

"From this duty existing in the very nature of the State government, flows the corresponding power to impose upon municipalities of its own creation a police force of its own creation, and to compel its support out of the municipal funds.   Such is the conceded doctrine by the most learned of our writers upon con-

stitutional law, and such the consensus of judicial decision throughout the United States.

"Wherever the Legislature has the right to assume control of a municipal office, it has likewise the right to compel the city to provide for defraying the expenses of such office, and while it is sometimes difficult to draw the line and distinguish whether a given office is of a public or State character or is simply one to subserve a municipal function, it is almost universally conceded that police boards and metropolitan police forces are State officers and fall clearly within legislative control."

The distinguished jurist then reviewed the authorities upon the question, and quoted at length from both Cooley and Dillon, showing the views of both of those great jurists were in harmony with his own. Cases from Michigan, Massachusetts, Maryland, Louisiana, and Kansas, were likewise cited and quoted from to the same effect. At the expense of brevity I quote from the Mason case, supra, the language of Judges COOLEY and DILLON. In the Mason case it was further said:

"Judge COOLEY in his work on Taxation (2 Ed.), p. 681, says: 'One of the first and highest of all duties devolving upon the State is to preserve the public peace. For this purpose, peace officers are chosen, judges selected, the militia organized, and the executive armed with very high powers to meet the contingencies of riot and disorder. . . . In general, the belief has prevailed that the public peace and good order were better preserved by apportioning the duty among the several municipal divisions, retaining only a State supervision over all. . . . But if the local authorities were allowed unlimited discretion to levy or refuse to levy the necessary taxes for the support of the local police force, it might possibly happen, that, from neglect or refusal to do so, one part of the State might be left a prey to disorder and violence, to the general detriment of the State at large. Of course no State could

safely, for a single day, tolerate such a condition of affairs. A city or township could no more be left at liberty to decline taxation for police purposes, when the police laws and police force, and the tax which supports them are made by local law, than if all were general. The police organization of the State is really general, however it may vary in different localities, and the obligation to support it is general, however it may be apportioned. . . . The power that prescribes police regulations and varies them to meet the needs of different localities has undoubted authority to apportion the money raised for general purposes, on its own view of the local needs. The Legislature may, therefore, require a county to appropriate part of its revenue to the special needs of the police board within its limits, and an act for that purpose is liable to no constitutional objections.'

"Judge DILLON in his admirable work on Municipal Corporations (4 Ed.), in note 1, section 60, says: 'There is nothing in the maxim that "taxation and representation go together," that can preclude the Legislature from establishing in a city a metropolitan police board, with power to estimate the expenses of the police, and compelling the city authorities to raise by taxation the amount so estimated. Every city is represented in the State Legislature; and it is for that body to determine how much power shall be conferred by the municipal charters which it grants.'

"Judges COOLEY and DILLON in these extracts clearly sum up the result of the authorities."

It would be a step backward for us now to say that the State of Missouri can't provide a police system for its great cities. It is a mistaken view to urge that the cities alone are interested in this matter of a police force adequate to maintaining the public peace and safety of our citizenship. The State has a vital interest. The citizens of the State, and all parts of it, are forced to these metropolitan centers for business

and other reasons. They may not linger long, but while there, they are entitled to that protection which only an adequate and efficient police force can give. It is not for the cities to say to the State that "we will give your citizens just such protection as we think is best." Nor can such cities say to the State, "You may man and control the police force if you desire, but if so we will starve your system to death—we hold the purse strings." These municipal corporations are subordinate to the sovereign power of the State, and whilst they do in a sense hold the purse strings, they so do by the consent of the State. Without the authority of the sovereign they would not even have a purse, much less the strings of one. The power which gave them the purse can limit the use of it. The power which placed upon that purse the strings, can loosen the strings.

So that we reiterate, by saying that it would be taking a step backward in jurisprudence to hold that the State cannot provide a metropolitan police force for our cities and compel those cities to pay the expenses thereof. Upon this question we are fully satisfied with the ruling in the Mason case, supra, and adhere to that ruling.

V. Counsel for respondents urge that inasmuch as Kansas City is operating under a special charter adopted under the provisions of section 16 of article 9 of the Constitution it is beyond the control of the State in matters of local self-government, and *arguendo* they insist that such city has control of the police located therein. This is not the first time that Kansas City has made this contention with reference to its police department. [*Vide* State ex rel. v. Police Commissioners, 80 Mo. App. 206, 184 Mo. 109.] In this case it was contended that the charter of the city was a law unto itself and the State law must give way to the provisions of the charter. But neither the Court of

Appeals nor this court took that view of it. In an elaborate and cautiously written opinion, ELLISON, J., for the Kansas City Court of Appeals, said:

"The important question to determine and which, as we have just said, was not considered in the Vallins case, 140 Mo. 523, since it did not arise therein and was not referred to by court or counsel therefore, is whether the Laws of 1874 and of 1875 and 1881 amendatory thereof, are yet in force and govern the Board of Police Commissioners, and, in any point of substantial repugnancy, which must give way, the law or the charter. Kansas City is organized under a special charter adopted by its own people. In matters of purely municipal concern the provisions of the charter supersede the provisions of the general law on the same subject existing when the charter was adopted, when not inconsistent, or out of harmony, with the general law. Thus, though the general law of the State provided a procedure for the exercise of the power of eminent domain in the condemnation of streets, yet this was superseded by the provisions of the charter in that respect, those provisions preserving the same substantial rights to parties affected which were guaranteed by the general law. [State ex rel. v. Field, 99 Mo. 352; Kansas City v. Oil Co., 140 Mo. 458.]

"While much important governmental power concerning matters of strictly municipal or local concern may be legally embodied in the charter, yet the charter must remain in subjection to the general law. This is constantly iterated by the Supreme Court in what are known as the Park cases. [Kansas City v. Oil Co., 140 Mo. 458; Kansas City v. Ward, 134 Mo. 172; Kansas City v. Scarritt, 127 Mo. 642.] In the Oil Company case it is said that whenever a charter so framed comes under judicial review the inquiry is, is it in harmony with and subject to the law of the State? It is there further said, that the charter must not invade the prov-

ince of general legislation, or attempt to change the policy of the State. In respect to all matters involving the relation of the city to the State and the full exercise of what is commonly known as the police power of the State the act of the Legislature will annul provisions of such a charter on the same subject. [St. Louis v. Dorr, 145 Mo. 466.]

"There are a number of illustrations of these general statements. Thus, there was a conflict between the general law and the charter of St. Louis as to the method of extending taxes and it was held the charter must give way. [State ex rel. v. Railroad, 117 Mo. 1.] In the same city there were specific provisions as to the licensing of dramshops and the collection of the revenue therefrom. In 1893 the Legislature provided for the appointment by the Governor of an excise commissioner, who, under the provisions of the act, took charge of that general subject, including the city license and revenue. The act has been upheld and the city ordinances, passed under the charter, superseded. [State ex rel. v. Bell, 119 Mo. 70.] The same recognition of the rule that special charters like those of Kansas City and St. Louis are subject to the general law of the State is found in numerous other cases. [State ex rel. v. Tolle, 71 Mo. 645; State ex rel. v. Miller, 100 Mo. 439; State ex rel. v. Higgins, 125 Mo. 364.]

"After the people of St. Louis had adopted their special charter, the Legislature passed an act concerning elections and for the appointment of a recorder of voters in all cities having a population of one hundred thousand or over, which included St. Louis. By the provisions of the charter and ordinances of that city it was the duty of the mayor thereof to appoint judges and clerks of election ten days before election day. An election was about to take place in said city for president of the board of assessors. The mayor was engaged in appointing the judges and clerks and

at the same time the recorder of voters, appointed by the Governor under the act of the Legislature, was also about to appoint men to the same positions. On an injunction to restrain the recorder the Supreme Court held that provisions of the charter and ordinances inconsistent with the act of the Legislature were annulled. It was said by the court that the charter was subject to the law; and that cities acting under such charters were not to be considered as a sovereignty within a sovereignty."

Later on in the same case Judge ELLISON further says: "But where, in the discretion and judgment of the board the force is more numerous than it should be, it has the additional power under the law to reduce the number by discharge from the service without notice or hearing. That the charter cannot change the State law in this respect is apparent, unless we set up the charter as superior to the State law. To grant such potency to the charter we would be brought to the position, as stated by the Supreme Court, that the power of appointment could be taken from the Governor and invested in some city functionary. And furthermore that a wholly different system of police could be introduced by the city, or indeed none at all; and thus the policy of the State be subverted."

The case reached this court, and in 184 Mo. l. c. 132, this court said:

"This narrows the case to this: Under the charter the relator was wrongfully discharged, but under the State law his discharge was legal. Which law governs? The Kansas City Court of Appeals, in an able and elaborate opinion, by ELLISON, J., held that the State law controlled, and that the discharge was legal, and that conclusion was right.

"It is unnecessary, and would be futile at this time, to tread again the mazes of adjudication, perhaps to become lost in the labyrinth of the ingenious and divergent reasons which pervade the cases in re-

spect to the power of the State over municipalities incorporated under article nine of the Constitution, and in respect to the power of municipalities to adopt charters regulating matters of mere local concern, with which the State at large has no concern, which have the effect of repealing prior general State laws on the same subject, or which place such cities in respect to such matters beyond State control. The views of the author hereof on these questions are well known, and were expressed, in Owen v. Baer, 154 Mo. 434, at great length, with painful care, after exhaustive investigation, and with such poor results, that repetition or reiteration here would be offensive. .

"No discussion of such questions is appropriate in this case, for this court held in State ex rel. v. Mason, 153 Mo. l. c. 43, that an act creating a board of police commissioners and regulating the appointment of a police force for any city in this State is constitutional, and that such board and such metropolitan police officers are State officers. In that case GANTT, C. J., said: 'Laws like these and those of other States providing a metropolitan police system for large cities, are based upon the elementary proposition that the protection of life, liberty and property and the preservation of the public peace and order in every part, division and subdivision of the State, is a governmental duty which devolves upon the State and not upon its municipalities any further than the State in its sovereignty may see fit to impose upon or delegate it to the municipalities. The right to establish the peace and order of society is an inherent attribute of government, whatever its form, and is coextensive with the geographical limits thereof, and touching every part of its territory.'

"Hence the Act of 1874 related to a matter which primarily belongs to the State, in which every citizen of the State had an interest, and which was therefore not simply a matter of local concern. This being true,

no decision that has so far been rendered gives any color or countenance to the power of the city to repeal such a State law by adopting a special charter under section 16 of article 9 of the Constitution which contains inconsistent or variant provisions touching the same subject.

"In fact that section of the Constitution expressly provides that the city may adopt a charter for its own government, but it limits this by requiring that the charter so adopted must be 'consistent with and subject to the Constitution and laws of this State.'"

In fact the very constitutional provision behind which respondents seek to hide, limits the scope of their charter powers. Such document, upon matters of general State concern, as is the peace and safety of its citizens, must be subject not only to the Constitution, but the laws of the State as well.

The first board of police commissioners for Kansas City was created by the Act of 1874. [Laws 1874, p. 327.] By this act the Governor appointed all three of such commissioners. By Act of 1875 (Laws 1875, p. 193), the law was amended so that the mayor was made *ex officio* a member of the said board, and the Governor appointed the other two. This provision continues to this day, although many amendments to the original act have been made. In these acts the city was specifically named. After 1875 the laws began to assume the plane of general laws. But we need not go into detail. There is a law of the State which covers this governmental question of State interest, and it makes no difference whether such law antedates the city charter or not, such city charter must give way to the general law. [State ex rel. v. Police Commissioners, 80 Mo. App. 206, 184 Mo. 109, supra; State ex rel. v. Bell, 119 Mo. l. c. 75; State ex rel. v. Railroad, 117 Mo. l. c. 11.]

There is therefore no substance in this contention of the respondents. A metropolitan police force is a

matter of general State concern, so that even if there were diverse provisions in the city charter (a matter we do not discuss, because not necessary) such provisions of the charter must yield to the State law. The establishment of a metropolitan police system for the large cities is but the exercise of the police power of the sovereign State.

VI.   Counsel for respondents are finally driven to the position that the law applicable to Kansas City is different from the St. Louis law considered in the Mason case, supra, and for reasons not discussed in that case, this law is bad. It is first said:

St. Louis and Kansas City Charters.

"There are, in fact, a number of essential differences between the statute applicable to St. Louis (Secs. 9802 et seq., R. S. 1909) and the statute applicable to Kansas City (Secs. 9764 et seq., R. S. 1909).

"(a)   By section 9806, the police commissioners of St. Louis are required, without discretion, to employ a specific number of policemen.

"By section 9787, Revised Statutes 1909, the police commissioners of Kansas City 'may, as the service requires, appoint' not a specified number of policemen, but 'as the service requires,' in their discretion, officers and policemen."

Counsel do not make a fair comment upon this section 9787. The section in full reads:

"The board may, as the service requires, appoint officers and patrolmen, as follows: A chief of police, at a salary of four thousand dollars per annum, and he shall not receive any fees or perquisites; one chief of detectives, at a salary of two thousand eight hundred dollars per annum; a secretary of the board, at a salary of two thousand and one hundred dollars per annum; captains, not to exceed one for each police district, at a salary of one thousand and eight hundred dollars each per annum; lieutenants, not to exceed one

for each police district, at a salary of one thousand and five hundred dollars each per annum; sergeants, not to exceed four to each police district, at a salary of one thousand and two hundred dollars each per annum; secretary of the chief, at a salary of one thousand and five hundred dollars per annum; a police surgeon, at a salary of not to exceed one thousand and eight hundred dollars per annum, to be fixed by the board, and he shall perform such additional duties as may be prescribed by ordinance; detective sergeants, not to exceed one for every fifteen detectives, at a salary of one thousand and five hundred dollars each per annum; police detectives, not to exceed one for every fifteen patrolmen, at a salary of one thousand and three hundred and eighty dollars each per annum; patrolmen, not to exceed one for every seven hundred inhabitants, the estimate to be taken from the best known source for obtaining such information: *Provided,* however, that for extraordinary emergencies the board may raise such additional force as may be deemed necessary in its judgment. The salary of regular patrolmen shall be one thousand and eighty dollars each per annum, and probationary patrolmen shall receive seven hundred and eighty dollars each per annum; police matrons, at a salary of seven hundred and twenty dollars each per annum; police signal operators, not to exceed three for each police station, at a salary of seven hundred and twenty dollars each per annum; one property clerk, at a salary of one thousand and two hundred dollars per annum; hostlers, not to exceed two for each police station, at a salary of seven hundred and twenty dollars each per annum; turnkeys, not to exceed two for each police station, at a salary of seven hundred and twenty dollars each per annum; drivers, not to exceed two for each police station, at a salary of seven hundred and twenty dollars each per annum.''

This statute places a limit upon every act of the commissioners save and except the number of police districts and as to that nothing is said. In every other respect there is a limit beyond which the Board of Police Commissioners cannot go. The number of the patrolmen is the real basis of the force. That is definite which can be made definite. The utmost limit of patrolmen is one for every 700 inhabitants, the population from time to time to be determined by the Board of Police Commissioners. The Legislature has thus fixed a limit beyond which the Board of Police Commissioners cannot go in establishing the force. The salaries of each class is fixed. It is true that it is left to the commissioners to determine the population, but this does not invalidate the act. It may also be true that such commissioners are left to fix the number of police districts, and if they increase or decrease the number it makes but little change in the force. The basis of the force, under the statute, is the number of patrolmen, and that number cannot exceed one for every 700 population. To add a district would only add one captain, one lieutenant and four sergeants. To cut off a district would only cut off these six men. The law was intended to be flexible, and rightfully so, but this does not make it violative of any constitutional provision.

There are these and some other differences between the St. Louis law (long since declared to be constitutional) and the Kansas City law, but we are pointed to no constitutional provision which would be violated by this law, which would not be violated by the St. Louis law. In fact, the amended return in this case does not charge that the law creating the metropolitan police system for Kansas City is unconstitutional in anyway, save and except that it is claimed that under the Constitution the charter provisions have precedence over the law. The only thing in this

amended return which even touches the constitutional-ity of the law reads as follows:

"Respondents allege that Henry L. Jost is a duly elected and qualified mayor of Kansas City, Missouri, and that the other respondents in said cause constitute the Upper and Lower House of the common council and as such are controlled by the provisions of the charter of said Kansas City, which city charter was adopted under the provisions of section 16, article 9, of the Constitution of the State of Missouri, and that such charter provides 'that within the first month of each fiscal year the mayor and common council shall by ordinance as far as practicable make an apportion-ment of the revenues to be raised for such year to the expenses of the several departments and for all public work under the proper headings and for such other objects as it may be necessary to provide for, and the money then in the treasury subject to the apportion-ment and municipal revenues shall be distributed ac-cordingly.'

"The respondents say that in accordance with the provisions of the said charter, after estimating the revenues of the city for the fiscal year beginning April 20, 1914, at the sum of $2,820,000, which said estimate was proper and reasonable, an ordinance was intro-duced in the common council of Kansas City, Missouri, apportioning said amount among the several depart-ments of the city, which sums so apportioned comprised an estimate of all revenue that would be derived from all sources during the fiscal year of 1914, and said ordi-nance being ordinance No. 19780 and entitled an ordi-nance apportioning the general fund and revenue of Kansas City, Missouri, for the fiscal year 1914, made the following apportionment."

From the beginning to the end of this amended return this is the only hint of a constitutional ques-tion, and it goes to a point already disposed of in this opinion, i. e., that the charter provisions, whilst pro-

mulgated under section 16, article 9, of the Constitution must give way to a State law. The constitutionality of the St. Louis law was directly reviewed from several angles, but this court held it constitutional. That ruling, with what we have added here, as to the Kansas City charter provisions being subservient to the State law, leaves the metropolitan police law applicable to Kansas a valid and live law. Respondents themselves do not further question it, as indicated by this excerpt from their return, supra, and we shall discuss that branch of the case no further.

VII. Proceeding now upon the theory that the law relating to the police system of Kansas City is a valid and binding law, how stands the case? Respondents urge that Kansas City hasn't a population of 275,000, but say that we must take the United States census of 1910 as the basis. The law does not say so. The number of patrolmen must not exceed "one for every seven hundred inhabitants, *the estimate to be taken from the best known source for obtaining such information.*" This means at the date and time the estimate is made. Under the law the police commissioners are empowered to *estimate* the population, but they need not go to the last United States census for it. They, under the law, may go to "the best known source for obtaining such information." The law uses the word "estimate," which does not indicate that the United States census is the only source of information referred to by the legislators. A census is a finding of the population and not an estimate of the population. The lawmakers had in mind that some cities might forge far ahead between the decennial periods of the Federal census, whilst others might fall back. They aimed to meet this situation in this law, by authorizing an estimate of the population.

*Amount of Demand: Population: Insufficient Revenue.*

265Mo.6

The police commissioners took into consideration the last school returns, the last election returns, the estimate of the waterworks department of Kansas City, based upon recognized rules for estimating population, and other similar sources. Upon this question, the commissioner appointed by this court made the following finding:

"Therefore, I find that the estimate of the population by the Board of Police Commissioners was fair and reasonable and that on the 20th day of April, 1914, the number of the inhabitants in Kansas City, Missouri, was at least the sum of two hundred and seventy-five thousand."

As to the appropriation demanded the commissioner of this court found:

"From the foregoing, and considering also a large volume of other evidence on the subject not summarized here, I find:

"First. That there existed on April 20, 1914, a necessity for the addition of more men to the police force of Kansas City, Missouri.

"Second. That the sum of money demanded by relators, to-wit, $650,000, will provide an adequate police force for the protection of the lives and property of the citizens of Kansas City, Missouri; and that there exists a reasonable necessity for the expenditure of said sum for that purpose in the fiscal year.

"Third. That the expenditure of said sum will not produce a police force in excess of the number authorized by the provisions of section 9787, Revised Statutes 1909."

It should be stated that our commissioner also found that the appropriations actually made by respondents to other departments of the city were necessary to the needs of those departments. All of these findings are well founded in the facts of the case, and we shall accept them as correct. In fact, counsel for respondents do not deny that $650,000 is not a rea-

sonable sum for the police department of the city, but only claim that it would tend to cripple other departments to take that much out of their general fund for this one purpose.

The mayor of the city, in a splendid argument of his case before this court, did not deny the fact that more police protection was necessary, but argued that he could not afford more than $500,000 out of the funds he had at his disposal, and properly take care of a deficit created before his term, and the other departments of the city government. These admitted facts bring us to face a plain legal proposition, and this we take up now. It is found that the demand made by relators was clearly within the law. It is found that the number of policemen provided for in the demand of relators is not in excess of the number provided by law. In other words the Board of Police Commissioners have made a demand fully authorized by the law, and even less than they might have demanded. On the other hand it is contended that, considering the demands of other departments, the demand of the police commissioners is unreasonable. We have here the square issue. Even if it be conceded that there is a discretion in the police commissioners as to the demands of their department, what governs that discretion? If the law gives them a discretion, and they have exercised that discretion clearly within the limits fixed by the law, can it be disturbed? We think not. Their discretion goes to the demands of the police department solely.

But let us go deeper. If, as we have held, the State can by law establish a metropolitan police system, and if by law, as, we have held, the State can compel the municipality to pay the support of such system, then isn't the fault with the Legislature and not with the officers called upon to enforce the legislative act. Had this law said there must be one policeman for every 700 inhabitants and fixed the salaries as it does,

what could the city have said when the demand was made for the necessary funds for support. Evidently she could have only said that the Legislature had passed an unreasonable and harsh law, if in fact it was such a law. But the law is not bad for that reason. The Legislature is the sole judge of the reasonableness of the law. Even the courts cannot declare laws void, because the courts may deem them unreasonable. The remedy is with the Legislature and not elsewhere.

Now, if the respondents could not evade the demand under a law where the State had said you must pay for one patrolman, and other necessary officers with the patrolmen, for every seven hundred inhabitants, how can they evade the demand of the police commissioners, the State's agents, who are empowered to fix a number within a given maximum? Under the Mason case, supra, they could not evade the demand in the first-mentioned case. Can they in the latter? We think not. Under the Kansas City law the State empowers a given body to fix the required force from time to time, within given limits. This body in good faith, and clearly within the terms of the act fixes the force. In the absence of fraud or bad motives, these acts cannot be questioned. We need not discuss bad motives, for it is conceded in this case that the police department for efficiency needs the men. The law may be unreasonable, but that does not empower this court to act. The Legislature is the judge of that. Had the Legislature said to Kansas City and other cities of her class, you must use one-half of your funds for the metropolitan police system established by the State, this court might think the law an unreasonable law, but we could not permit an evasion of it for that reason. We can declare ordinances void for being unreasonable in their particular application, but not laws.

If therefore we concede the power of the State to establish a metropolitan police system, as we must,

and if we concede the power of the State to demand of the city the support of that system, as we must concede, then the reasonableness of the State's demands as to amounts as fixed by law is not for the courts. So in this case if the demand made is one thoroughly within the law, this court is powerless to help the respondents.

The very able mayor of this unfortunate city has asked us to point to the place where he can get the money to meet the demands. Counsel for relators undertake to point to the place. But we will not go into the matter of facts. We will only say that the record before us shows increased appropriation for most of the departments from 1910 to date, whilst it shows a decrease for the police department. We can only say to those officers of Kansas City that the law points to them the way. It requires the police commissioners to make their estimate and demand at the beginning of your fiscal year. If that demand is within the law, you are then in position to meet it. At the time the law requires it to be made you have before you the whole city loaf to be cut and distributed. The law says that at the instance of the sovereign State you must cut a certain slice of that loaf for police protection to your citizens and the other citizens of the State. You then had it within your power to meet the demands of the law. If the law is a harsh one go to the Legislature.

There are other minor matters in the briefs, which we have examined and found to be without substance.

From what has been said it follows that our peremptory writ should go, and it is so ordered: *Brown, Bond* and *Blair, JJ.,* concur; *Woodson, C. J.,* dissents in an opinion filed; *Faris, J.,* dissents; *Walker, J.,* not sitting.

WOODSON, C. J.—I am unable to fully agree with the conclusions reached in the majority opinion filed

in this case, and must therefore express my views as to points of diversion.

I do not endorse the extreme views taken by counsel for either party.

In my opinion, it was not the intention of the lawmakers to empower the Board of Police Commissioners with unlimited authority to compel the city to appropriate whatever sum of money it might see proper to demand for the use of the police department regardless of the requirements of the city for the support and maintenance of the various other departments thereof. If that was true then the Board of Police Commissioners would have the power to compel the city to appropriate for its use and support the entire revenues of the city, the $1,800,000, and thereby completely destroy the city government.

Nor upon the other hand, do I believe that it was the intention of the lawmakers to invest the city with the arbitrary power to withhold all support from the police department. If so, then the city would totally destroy the metropolitan police system, a State institution as well as a city institution, and thereby place its authority above the power of the State; and at the same time endanger the peace and safety of the city, by destroying all police protection and regulations.

My opinion is that it was the intention of the lawmakers that the entire revenues of the city should be ascertained for each fiscal year, and after that had been done, the police board and the city authorities should meet and consult together and consider the various departments of the city, including the police department, and estimate the proportionate amount each will contribute to the peace, safety, health and wellbeing of the city, and the relative amount of money that will be required for their support and maintenance, and then apportion the entire revenues of the city among all of the departments upon that basis.

State ex rel. v. Jost.

In other words, the laws creating the other departments of the city are just as valid and binding as that creating the police department, and just as useful for the wellbeing of the city, differing only in degree, all of which must be maintained out of the revenues of the city, and that should be done in proportion to the amount of good each contributes to the wellbeing of the city. This is unquestionably what the lawmakers intended, and if that mode of distribution of the revenues of the city is followed, then all departments will be maintained upon an equal footing, and equally prepared to perform their duties to the city and State; and at the same time prevent the city from crippling the police department, and the latter from crippling the city or any of her departments.

Getting down to the facts of this case: During oral argument I was of the opinion that the deficits of the city were not legal obligations against it, and should not therefore be taken into consideration in the distribution of the revenues among the various departments. But since investigations made I have changed my opinion in that regard; and find that they are legal demands against the city, and she must pay them, which must come out of the revenues of the city.

With these preliminary observations as to the rules of law which should govern these matters, and after applying them to the distributions made to each department, when considered in the light of their relative benefits to the city, as shown by the evidence in the case, I am unable to see wherein any unjust discrimination has been made against the police department.

I therefore dissent.