In the Matter of the Application of FRANK H. SPINK, JOHN W. BALLARD, JAMES B. KERRIGAN, IRVIN FANE and WILLIAM E. KEMP, Constituting the BOARD OF POLICE COMMISSIONERS OF KANSAS CITY, MISSOURI, and Acting for and as Said BOARD OF POLICE COMMISSIONERS OF KANSAS CITY, MISSOURI, Relators, v. WILLIAM E. KEMP, ROBERT J. BENSON, HARRY S. DAVIS, ILUS W. DAVIS, THOMAS J. GAVIN, REED O. GENTRY, DON JACKSON, JOSEPH M. NOLAN, WALTER R. SCOTT, and L. P. COOKINGHAM, Respondents, No. 44534—283 S. W. (2d) 502.

Court en Banc, September 29, 1955.

Rehearing Overruled in Per Curiam Opinion Filed, November 14, 1955.

370

*Harry F. Murphy* and *Cornelius Roach III* for relators.

*David M. Proctor,* City Counselor, *John J. Cosgrove,* Associate City Counselor, and *J. L. Parks,* Assistant City Counselor, for respondents.

[507] HOLLINGSWORTH, J.—Original proceeding in mandamus. Relators as the members of the Board of Police Commissioners of Kansas City, Missouri, seek to compel the Mayor, the Council and the City Manager of said City to appropriate an amount in excess of that appropriated to meet the expenses of the [508] Police Department for the fiscal year beginning May 1, 1954.

Section 84.730 RSMo 1949, V.A.M.S., provides:

"It shall be the duty of said board [of Police Commissioners], on the fifteenth day of January of each year, to prepare, in writing, a budget estimating the sum of money which will be necessary for the next fiscal year, to enable said board to discharge the duties hereby imposed upon it, and to meet the expenses of the police department, which it shall forthwith certify to the governing body of such cities, * * * *. Said governing body of such cities is hereby required to appropriate the total amount so certified, payable out of the revenue of said cities after first having deducted the amount necessary to pay the interest on the indebtedness of said cities, the amount necessary for lighting the city, and any sum required by law to be placed to the credit of the sinking fund of said cities, * * * except that in no event shall the governing body of such cities be required to appropriate for the use of the police board in any fiscal year an amount in excess of one-sixth of the general revenue fund of such year."

The petition alleged that pursuant to the provisions of said section relators made and certified to respondents an estimate of $4,028,726 as the amount necessary to enable the board of police commissioners to discharge its duties and to meet the expenses of the police department for the aforesaid fiscal year, which said sum, it was alleged, the council, by virtue of the provisions of said statute, was required to appropriate because it is not in excess of the maximum amount fixed therein, but that it refused so to do and did appropriate a lesser sum, to wit: $3,551,354. In an amended return to our alternative writ issued pursuant to the provisions of Art. V, §4, Constitution of Missouri, respondents alleged that the sum demanded by relators was in excess of one-sixth of the general revenue fund for the fiscal year beginning May 1, 1954; that the sum of $3,551,354 theretofore appropriated was likewise in excess thereof, and that the alternative writ should be quashed.

The issues being thus joined, this court appointed Honorable Christian F. Stipp as Special Commissioner to take testimony and to report his finding of facts and conclusions of law, which he has ably

and painstakingly done. Both parties have filed exceptions to certain conclusions of law reached by the Special Commissioner and to numerous of his findings as to whether certain items of revenue constitute a part of "the general revenue fund" of said fiscal year, within the meaning of § 84.730. (All statutory references herein are to RSMo 1949, V.A.M.S., unless otherwise indicated.)

Kansas City is a municipal corporation organized and existing pursuant to the provisions of a special charter framed and adopted by the people as authorized by the State Constitution. The city manager is the chief administrative officer and the members of the council and the mayor constitute the legislative body of the city. The Kansas City police department operates under the exclusive direction and control of the board of police commissioners which was created by state statute and whose members are appointed by the governor. § § 84.350-84.860. Pursuant to the provisions of state law, charter provision and fiscal direction, the various departments of city government and the police department submitted to the city manager their budget requests for the fiscal year 1954-1955 which began on May 1, 1954. The city manager prepared the annual budget for the city for that year in which he estimated the revenues which would be received and recommended the appropriations to be made. The relators had certified a budget of $4,028,726, but the city manager recommended an appropriation of $3,551,354. The budget, with the latter amount, was subsequently approved by the council and the appropriation made.

In the preparation of the city budget, the anticipated revenue was allocated to various funds in the city treasury as follows:

| [509] | | | *Allocation* | |
| Item | Source of Revenue | Fund | Amount |
|---|---|---|---|
| 1. | General Property Tax Levy (10.39) | General | $7,911,021 |
| 2. | General Property Tax Levy (4.61) | General Debt and Interest | 3,505,746 |
| 3. | Special Park Tax Levies | East Park | 131,260 |
| | | West Park | 197,220 |
| 4. | Cigarette Stamp Taxes | General | 950,000 |
| | | East Park | 105,556 |
| 5. | Gasoline and Motor Fuel Taxes | Street | 1,920,000 |
| 6. | Vehicle Licenses | General | 22,500 |
| | | East Park | 513,615 |
| | | West Park | 213,885 |
| 7. | Parking Meter Receipts | General | 115,000 |
| 8. | Taxicab Driver's Licenses | General | 4,500 |

| | | | |
|---|---|---|---:|
| 9. | Revenue from Other Street Uses | General | $ 42,000 |
| 10. | Alcoholic Beverage Licenses | General | 303,500 |
| 11. | Business, Professional and Occupational Licenses | General | 1,658,420 |
| | | East Park | 380 |
| 12. | Kansas City Power and Light Gross Receipts Tax | General | 1,540,000 |
| 13. | Gas Service Company Gross Receipts Tax | General | 786,365 |
| 14. | Public Transportation Company—Bus Licenses | General | 122,000 |
| | | East Park | 40,665 |
| 15. | Public Transportation Company—Street Car Licenses | General | 22,000 |
| 16. | Steam Company License | General | 58,000 |
| 17. | Telegraph Company Franchise Taxes | General | 1,000 |
| 18. | Natural Gas Company Gross Receipts Tax | General | 8,500 |
| 19. | Telephone Company Gross Receipts Tax | General | 912,500 |
| 20. | Dog Licenses | General | 42,000 |
| 21. | Municipal Court Fines and Forfeitures | General | 685,000 |

[510]

| | | | |
|---|---|---|---:|
| 22. | Traffic Bureau Fines and Forfeitures | General | 355,100 |
| 23. | Circuit Court Fines and Forfeitures | General | 35,000 |
| 24. | City Hall Rents and Concessions | General | 37,970 |
| 25. | Municipal Auditorium Receipts | General | 258,100 |
| 26. | Net Rentals from Veteran's Housing Project | General | 75,000 |
| 27. | Municipal and Platte County Airport Receipts | General | 443,095 |
| 28. | Grandview Airport Receipts | General | 670 |
| 29. | Park Property Rentals and Concessions | East Park | 30,750 |
| | | West Park | 750 |
| 30. | Rental of Miscellaneous City Owned Property | General | 50,120 |
| 31. | Rentals and Concessions | General | 16,950 |

| | | *Allocation* | |
| | | | |
| *Item* | *Source of Revenue* | *Fund* | *Amount* |
| 32. | Interest Earnings | General | $ 80,000 |
| | | General Debt and Interest | 80,000 |
| 33. | Accrued Interest on Bonds Sold | General Debt and. Interest | 5,000 |
| 34. | Interest on Investments | .Water | 175,000 |
| | | Sewer Special Assessment | 17,157 |
| | | Street and Avenue Spec. Assessment | 5,297 |
| | | Cumulative Insurance Reserve | 2,500 |
| 35. | Interest on Special Assessments | Sewer Special Assessment | 22,000 |
| | | Street and Avenue Spec. Assessment | 7,000 |
| 36. | Produce Merchants' Rentals | Public Market | 107,500 |
| 37. | Stall Fees | Public Market | 7,000 |
| 38. | Reservation Fees | Public Market | 6,000 |

[511]

| | | | |
|---|---|---|---|
| 39. | Kansas City Southern Railway Right-of-Way Easement | Public Market | 8,000 |
| 40. | Miscellaneous Market Revenue | Public Market | 700 |
| 41. | Service Refunds | Public Market | 2,500 |
| 42. | Parking Lot Rentals | Public Market | 4,200 |
| 43. | Weighing Fees—Public Scales #1 | Public Market | 6,500 |
| 44. | Surplus Commodities Distribution Fees | Public Market | 2,000 |
| 45. | Rental from Telephone Pay Stations | Public Market | 150 |
| 46. | General Government Service Charges | General | 6,715 |
| 47. | Street Cut Repair and Backfill Fees | General | 103,000 |
| 48. | Gas Cut Inspection Fees | General | 1,740 |
| 49. | Service Fees—Special Assessment Projects (Administration) | General | 12,000 |

| | | | |
|---|---|---|---|
| 50. | Service Fees—Special Assessment Projects (Engineering) | General | 72,000 |
| 51. | Recreation and Public Welfare Charges | General | 11,900 |
| 52. | Recreation Fees | East Park | 68,270 |
| | | West Park | 2,210 |
| 53. | Public Safety—Buildings and Inspection Division Fees | General | 208,490 |
| 54. | Public Safety—Smoke Regulation Division | General | 31,500 |
| 55. | Public Safety—Tow-in and Storage Charges | General | 100,000 |
| 56. | Public Health Charges | General | 91,055 |
| 57. | Hospital Charges | General | 234,870 |
| 58. | Boulevard Cut Repair Fees | East Park | 3,500 |
| | | West Park | 4,600 |
| 59. | Burial Permits and Cemetary Services | West Park | 450 |

[512]

| | | | |
|---|---|---|---|
| 60. | Sale of Fire and Extended Coverage Insurance | Cumulative Insurance Reserve | 35,000 |
| 61. | Municipal Farm Revenue | General | 363,600 |
| 62. | Farm Rentals | Water | 2,500 |
| 63. | Sale of Water | Water | 5,463,903 |
| 64. | Merchandising, Jobbing and Contracting | Water | 65,000 |
| 65. | Miscellaneous Public Enterprise Revenue | Water | 61,000 |
| 66. | Rental of Miscellaneous Buildings and Lots | Water | 120 |
| 67. | State Grant for Tuberculosis Hospital | General | 210,000 |
| 68. | Federal Reimbursement for Civil Defense Equipment | General | 299,000 |
| 69. | Land Clearance for Redevelopment Authority | General | 15,150 |
| 70. | Federal Payments in Lieu of Taxes | General | 3,520 |
| 71. | Contribution from Starlight Theater Association | General | 15,000 |

| Item | Source of Revenue | Allocation Fund. | Amount |
|------|-------------------|------------------|--------|
| 72. | Sale of City Real and Personal Property | General | 16,000 |
| | | East Park | 4,650 |
| | | West Park | 1,500 |
| 73. | Miscellaneous Non-Revenue Receipts | General | 11,750 |
| | | East Park | 350 |
| 74. | Sale of Stores | Working Capital | 481,049 |
| | | Public Works Working Capital | 240,455 |
| 75. | Sale of Postage | Working Capital | 38,558 |
| 76. | Service to Storerooms | Working Capital | 6,682 |
| 77. | Equipment Capitalized | Working Capital | 6,730 |
| 78. | Recoveries on Insurance Claims | Public Works Working Capital | 500 |
| 79. | Recoveries on Damage Claims | Public Works Working Capital | 400 |
| [513] | | | |
| 80. | Equipment Rentals | Public Works Working Capital | 308,650 |
| 81. | Intra-Fund Receipts | Public Works Working Capital | 93,070 |
| 82. | Reimbursable Services | Water | 225,000 |
| | | Working Capital | 69,381 |
| | | Public Works Working Capital | 40,260 |
| | | Insurance Revolving | 70,000 |
| 83. | Collections from Assessments | Sewer Assessment | 145,500 |
| | | Street and Avenue Special Assessment | 29,000 |
| 84. | Prior Year's Revenue | General | 762,340 |
| | | West Park | 49,485 |
| | | General Debt and Interest | 100,000 |
| | | Water | 35,249 |
| | | Street Repair and Maintenance | 27,353 |
| | | Insurance Revolving | 49,462 |

The fiscal system of Kansas City is set up on a "fund accounting basis". Income and disbursements are accounted for through many different "funds" and each "fund" may embrace several "accounts", the latter being managerial devices for ready determination of collections and disbursements. There is no "fund" designated as the "general revenue fund".

The meaning of the term "general revenue", as used in § 84.730, becomes a matter of first importance.

"By revenue, whether its meaning be measured by the general or the legal lexicographer, is meant the current income of the state from whatsoever source derived which is subject to appropriation for public uses. This current income may be derived from various sources, as our numerous statutes attest, but, no matter from what source derived, if required to be paid into the treasury, it becomes revenue or state money; * * *." State ex rel. Thompson v. Board of Regents, 305 Mo. 57, 264 S.W. 698, 700. See also State ex rel. McKinley Pub. Co. v. Hackmann, 314 Mo. 33, 282 S.W. 1007, 1011. It would seem clear therefore that the term "general revenue" would mean all current income of the city, however derived, which is subject to appropriation for general public uses, as distinguished from special uses.

One of the principal issues in the case is: May Kansas City, by authority of its charter or by ordinance, devote funds otherwise constituting general revenue to special uses, and in that manner deprive the state of the benefit thereof in reckoning "one-sixth of the general revenue fund" for the purpose of ascertaining the extent of the city's liability under § 84.730?

Obviously, if the city, by its charter or by ordinance, may devote a substantial portion of what ordinarily would be considered general revenue to a special use by [514] a process of "earmarking" its use for a special purpose and thereby take such portion so "earmarked" out of the category of general revenue, then the city may starve its state operated and controlled police department into utter ineffectiveness and create a situation which heretofore the state assiduously has undertaken to prevent by statutes such as § 84.730 and its forerunners. See State ex rel. Reynolds v. Jost, 265 Mo. 51, 67, et seq., 175 S.W. 591, 593, et seq.; State ex rel. Field v. Smith, 329 Mo. 1019, 49 S.W.2d 74, 76, 78; Laws 1939, pp. 558, 559; § 7676, RSMo 1939.

The Special Commissioner came to the conclusion that the term "general revenue fund", as used in § 84.730, meant and included "all current revenue of the city, however derived, which is not required to be devoted to a special purpose by constitutional, statutory, or *charter provision* or by covenants in bond obligations which are authorized by the constitution, the statutes or the *charter*." (Emphasis ours.) Respondents rest upon the labors of the Special Commissioner in reaching the above conclusion, asserting merely that he was correct in so holding, and citing the cases upon which the Special Commissioner

based his conclusion, to wit: Ex parte Siemens v. Shreeve, 317 Mo. 736, 296 S.W. 416; State ex rel. Carpenter v. St. Louis, 318 Mo. 870, 2 S.W. 2d 713; Morrow v. Kansas City, 186 Mo. 675, 85 S.W. 572; Kansas City v. Frogge, 352 Mo. 233, 176 S.W. 2d 498; Turner v. Kansas City, 354 Mo. 857, 191 S.W. 2d 612, and Kansas City v. J. I. Case Threshing Machine Co., 337 Mo. 913, 87 S.W. 2d 195. Relators vigorously disagree. They insist that in § 84.730 the General Assembly used the phrase "general revenue fund" as the collective designation of all that part of a city's current income, however derived, which is subject to appropriation for general public use, *excluding only that income which is appropriable solely for particular public uses under the specific authority of constitutional or statutory provisions explicitly requiring that such income be devoted to special purposes or be paid into special funds.*

The statutes creating the board of police commissioners of Kansas City and the police department thereof, defining their respective duties, powers and responsibilities, and providing for their maintenance, § § 84.350-84.860, expressly retain jurisdiction of the Kansas City police system as an agency of the state. American Fire Alarm Co. v. Board of Police Commissioners, 285 Mo. 581, 227 S. W. 114, 116-117 [1-3]. It is, therefore, hardly conceivable the Legislature could have intended that the city, chargeable as a state agency with the maintenance of the state controlled police department in the manner prescribed by § § 84.730 and 84.780, should at the same time have the power as a municipal corporation to defeat the legislative mandate of the State of Missouri through a policy of "earmarking", either by charter or ordinance, portions of its revenue that otherwise would constitute "general revenue" within the meaning of § 84.730. This does not mean that the city may not, for its own purposes, lawfully divide its funds or allocate them in any manner it sees fit or subject its general revenue funds to particular public purposes, so long as it does not do so contrary to statute or its charter. 64 C.J.S., Mun. Corp., § 1884, pp. 443-444. But we think it does mean the city may not, solely by authority of its charter or by ordinance, make such funds unavailable to the state under § 84.730. In so concluding, we reaffirm a principle long since announced and consistently followed in this state.

Kansas City could only frame and adopt a charter "consistent with and subject to the Constitution and laws of the state * * *." See what is now Art. VI, § 19, Constitution of Missouri. Its charter must not be out of harmony with the general laws of the state nor invade the province of general legislation or attempt to change the policy of the state as declared for the people at large, Kansas City v. Marsh Oil Co., 140 Mo. 458, 41 S.W. 943, 945-947; nor may it be out of harmony or in conflict with the controlling law of the state, State ex rel. Hawes v. Mason, 153 Mo. 23, 35, 60, 54 S.W. 524, 526, 534. [515] "The law

establishing the police commissioners [of Kansas City] and the system of police under them is an evidence of the policy of the state with reference to the police of one of its principal cities and it cannot be subverted by a local charter." State ex rel. Goodnow v. Police Commissioners, 80 Mo.App. 206, 219. See also same case, 184 Mo. 109, 133-134, 71 S.W. 215, 220; Coleman v. Kansas City, 353 Mo. 150, 161, 182 S.W. 2d 74, 77.

In State ex rel. Carpenter v. St. Louis, 318 Mo. 870, 2 S.W. 2d, 713, 721, we said: "The cases construing the police laws are in point. The state has authority to provide by general law for the establishment of a metropolitan police force in a city operating under a special charter, and compel the city to maintain it by taxation. * * * * In State ex rel. v. Mason, 153 Mo. 23, 54 S.W. 527, it was held that the city of St. Louis could be compelled, by mandamus to pay the expense of the police system of that city, established by an act of the Legislature (Laws 1860-61, p. 446). It is significant that the original legislative act supplanted the municipal system which had existed prior to that time. Id. loc. cit. 32 (54 S.W. 524). The opinion written by Judge Gantt, referring to earlier cases, says (loc.cit. 47 (54 S.W. 530)): 'The power of the Legislature to provide the necessary agencies to perform the high functions of the state in the preservation of * * * peace, etc., and to impose the duty of paying therefor on the locality for which * * * said agencies were created, was fully and firmly established.' "

The cases cited by the Special Commissioner and relied upon by respondents do not militate against the doctrine above announced. Each of them recognizes and holds inviolable the rule that the charter of a city (organized as is Kansas City) is subordinate to the will of the General Assembly insofar as it relates to governmental policy as distinguished from matters of local municipal concern.

It follows that we must and do sustain relators' contention and hold that general revenue of the city which is devoted to special purposes or allocated into special funds by virtue of the city's charter (and ordinances) is to be included in reckoning one-sixth of the general revenue fund under § 84.730, unless such charter provisions or ordinances placing such funds to a special purpose or into special funds were enacted pursuant to express or clearly implied constitutional or statutory authority.

In the light of the conclusion above reached, we now consider the specific items which relators contend the Special Commissioner erroneously excluded from the general revenue fund under § 84.730.

*Item 3,* designated in the Special Commissioner's report as "Special Park Tax Levies", aggregates $328,480. The Special Commissioner held that these levies were authorized by the Legislature under § 90.010 and were not allocable to the general revenue fund. Section 90.010 does authorize "any city" to levy a 2-mill tax, the pro-

ceeds of which "shall be known as the park fund". Relators concede that to the extent Item 3 consists of a 2-mill tax as provided in § 90.010 it constitutes a special fund expressly authorized by statute and is not allocable to general revenue. Said item is, however, the aggregate of a levy of a 2½-mill tax amounting to $272,370 and a "ten-cent-per-front-foot tax levy" amounting to $56,110, for which latter tax there is no statutory authority whatever. Relators therefore insist that all of said sum over and above a 2-mill levy, to wit: one-fifth of $272,370 ($54,474), and the front-footage tax in the sum of $56,110, total $110,584, must be allocated to general revenue. Respondents say that although the Special Commissioner correctly found that this item was not allocable to general revenue, he did so under an erroneous premise that § 90.010, upon which the Special Commissioner based his finding, is not applicable to Kansas City, citing Kansas City ex rel. North Park Dist. v. Scarritt, 127 Mo. 642, 29 S.W. 845; that the charter of Kansas City authorizes a [516] tax of 2½ mills; and that under the Commissioner's ruling to the effect that charter authorization was tantamount to legislative authority, he properly held such fund not to constitute general revenue within the meaning of § 84.730.

Section 60, Article III, of the city's charter authorizes the levy of a 2½-mill tax upon all of the real estate, exclusive of improvements, in each park district for the improvement and maintenance of the boulevard system under the jurisdiction of the Board of Park Commissioners. Section 62 authorizes a maintenance tax of ten cents per front foot of land abutting said boulevard system. It is apparent that Item 3 was obtained by virtue of these two charter provisions.

If we were to accept respondents' contention that § 90.010 did not apply to the situation here, then we should hold that all of the 2½-mill tax ($272,370) is allocable to general revenue, because of our conclusion that charter provisions for the earmarking of general revenue to special purposes in the absence of constitutional or express statutory authorization therefor do not authorize the diversion of the general revenue funds referred to in § 84.730 into special funds so as to defeat the purpose thereof. However, we are convinced that, despite respondents' assertion, § 90.010 does announce a legislative policy that impliedly authorizes the diversion of a 2-mill tax on the aforesaid real estate for park maintenance. To that extent, Item 3 is not allocable to general revenue. The portion of Item 3 realized from an excessive levy of one-half mill, $54,474, must be allocated to general revenue. But, even though the front-footage tax is without statutory sanction, we are convinced its nature and purpose is such it cannot be considered as general revenue under § 84.730. It is a limited local assessment against real estate abutting the boulevard system over and above the regular boulevard maintenance tax of 2½ mills levied against all real estate in the two respective park districts. (These two

districts include the whole of Kansas City. See § 56, Art. III, Kansas City Charter.) Presumably, such a special assessment is made against abutting property on the theory special benefits accrue thereto because of the proximity of such property to the boulevard system and, if so, it could not lawfully be diverted to a general purpose. Such a tax is not general revenue that has been earmarked, in violation of the principle hereinabove stated.

■ *Item 5*, designated as "Gasoline and Motor Fuel Taxes", in the amount of $1,920,000, was levied under the provisions of § 288, Art. VIII, of the charter, which provides that all taxes from the sale of gasoline or other motor fuel shall be appropriated for street maintenance or for payment of principal and interest on any bonds issued for such purpose. Concededly, there is no constitutional or statutory authority authorizing it to be so appropriated. The record is not clear, but it does appear that of these funds the sum of $162,761 is obligated to the payment of general obligation bonds of the city, which amount, relators concede, is deductible from the total of $1,920,000, leaving a balance of $1,757,239 allocable to general revenue under § 84.730.

■ *Item 6*, designated as "Vehicle Licenses", amounts to $750,000. Section 61, Art. III, of the charter authorizes the appropriation of all vehicle license taxes, except 3% thereof for firemen's pension funds, for the maintenance of parks, boulevards, etc. The application of the aforesaid 3% ($22,500) to firemen's pension funds is given express legislative approval by § 86.657, as a consequence of which $22,500 of said fund is properly excluded from the general revenue fund. However, there is no legislative authorization for the diversion of the balance of said funds, to wit: $727,500, and that portion of said sum must be included in general revenue under § 84.730.

■ *Items 36 through 45*, designated as "Public Market", amount to $144,550. (This does not include $45,407 allocated to the public market fund from the general debt and interest fund, and with which we are not here concerned.) The income [517] ($144,550) realized from operation of the city's public markets is paid over to the city treasurer as annual and current revenue. The city, pursuant to authority of its charter, has issued revenue bonds hypothecating this income. But no part of such income arises out of any debt owed by the city to people from whom the income is derived.

· Section 82.420 of the statutes makes it the duty of the city to establish a city market, but the Legislature has not seen fit to give the city authorization to issue revenue bonds hypothecating the income therefrom. Relators concede that had the Legislature authorized the city to pledge its income from public markets to the payment of revenue bonds, as it has authorized the city to do in the acquisition of parking facilities under § 71.360, we would then be confronted with a different situation. Even though the city's charter authorizes the issuance of

such bonds, yet such authorization cannot be asserted as against the state under § 84.730. We hold that Items 36 through 45, totalling $144,550, must be allocated to general revenue.

■ *Item 70,* designated as "Federal Payments in Lieu of Taxes", amounts to $3,520. This income is paid to the city by the Federal Housing Administration in lieu of taxes under a contractual arrangement between the city and the administration. It was allocated to the general fund by respondents, but the Special Commissioner held that it should be allocated to the general revenue fund, the general debt and interest fund and the east and west park funds in the proportion that property taxes were allocated by the Commissioner. The allotment to general revenue of its portion of this item, as thus computed by the Commissioner, was $2,045. Relators contend that Item 70 is not impressed with any trust, was commingled with general revenues and that the decision of the Commissioner as to its proper allocation has no relation to any contention of the parties, nor to any evidence introduced. We must agree with relators. While the money received by the city from the Housing Administration is in lieu of taxes, or more properly, perhaps, compensation for the loss of taxes, it is not revenue derived from taxes and it is not impressed with the specific uses to which general property taxes must be allocated. It follows that the whole of said item of $3,520 should be allocated to the general revenue fund.

■ *Item 84,* designated as "Prior Years' Revenue", was estimated as of January 1, 1954, to amount to $1,023,889. This estimated sum was by the city in its budget allocated in accordance with the City's aforesaid charter provisions as follows: General Fund, $762,340; General Debt and Interest Fund, $100,000; West Park Fund, $49,485; Water Fund, $35,249; Street Repair and Maintenance Fund, $27,353; and Insurance Revolving Fund, $49,462. (Concededly, for reasons not pertinent here, no portion of the General Debt and Interest Fund, the Water Fund, or the Insurance Revolving Fund is allocable to general revenue.) The Special Commissioner said of Item 84: "Item 84 represents the revenue to be received during the fiscal year 1954-1955 from activities of prior years and includes (1) revenue which was appropriated in prior years and which was not expended, and (2) revenues which were received in prior years in excess of the revenues expected to be received. This revenue is subject to appropriation for use in the various funds to which it was allocated. The revenue allocated to the general fund ($762,340) is a part of the general revenue fund of the city."

Relators contend that inasmuch as there is no constitutional or legislative authorization therefor the sum of $49,485 allocated to the West Park Fund and the sum of $27,353 allocated to the Street Repair and Maintenance Fund should be included in and added to the aforesaid

sum of $762,340, hereinabove allocated by the Special Commissioner to the general revenue fund.

Respondents contend: "Only $270,000 of this amount is definitely appropriable for state purposes. In prior years the total revenue was divided among the Police Department and the City Departments. [518] Savings were made in some of the city departments aggregating $141,500.00; that is, all of the money appropriated to them was not expended. The amount of these savings was carried forward into the fiscal year in question. Since it is a part of the total revenues from which the Police Department received its lawful share it should not again be included in the fund appropriable to the Police Department. If it were included the City would be doubly taxed, and the property of the City and its citizens would be taken without due process of law in violation of the 14th Amendment of the Constitution of the United States.

"$350,000 of the total amount in Item 84 represents an excess in collection from the amount of revenue estimated to be collectible in the fiscal year 1953-1954. This collection is from sources which we regard as local in character such as the City Hall, Auditorium, etc., discussed hereafter under Point VI. Should our contention in this regard be sustained this $350,000 as well as the $154,454 should be excluded from appropriations for state purposes."

Respondents' objection to the allowance of $350,000 of Item 84 because allegedly that portion of said item is derived from activities "local in character", as distinguished from activities arising out of the exercise of police power, will be hereinafter ruled adversely to respondents for reasons there more fully stated.

Respondents cite no authority in support of their contention that if such surplus is included in reckoning the city's liability the city would be thus doubly taxed, and the city's property would be thereby taken without due process of law in violation of the Fourteenth Amendment of the Constitution of the United States. The allocation of this surplus from prior years' revenue to the general revenue fund for determining the extent of the city's liability under § 84.730 does not amount to double taxation. "To constitute double taxation in the prohibited sense the second tax must be imposed upon the same property for the same purpose, by the same state or government *during the same taxing period* * * *." (Emphasis ours.) 61 C.J., Taxation, § 69, p. 137. The "general revenue fund of such year", as employed in § 84.730, is nothing more nor less than a *res*, that, by statute, is made the basis of computing the city's liability for that year. It is worthy of note that another section of the statutes, § 84.780, provides that the city's liability as determined under § 84.730 is payable "out of any moneys in the city treasury not appropriated to the specific purposes above enumerated in section 84.730", to wit: interest on indebtedness, lighting costs and established sinking fund.

Furthermore, when a municipality acts as an agency of the state, as Kansas City does in maintaining its police force, federal constitutional restraints do not apply against the state. City of Trenton v. State of New Jersey, 262 U.S. 182, 43 S.Ct. 534; City of Tulsa v. Oklahoma Natural Gas Co., 4 F. 2d 399, 403 [4-7]. See also State ex rel. Hawes v. Mason, 153 Mo. 23, 52 et seq., 54 S.W. 524, 532 et seq.

It follows that relators' contention must be sustained. The sum of $49,485, allocated out of the aforesaid surplus to the West Park Fund (less any portion thereof that may represent proceeds from the ten cent front-footage tax on properties abutting the boulevard system), should be and is allocated to general revenue, for the reason said sum is surplus over and above the total amount accruing to and received by the city from the 2-mill tax authorized by § 90.010, which is the statutory limit of the city's authority to earmark general funds for park purposes; and the sum of $27,353, allocated to the Street Repair and Maintenance Fund, should be and is allocated to general revenue for the reason that there is no legislative authority whatever for the allocation of general revenue to the Street Repair and Maintenance Fund; all as was more fully hereinabove discussed. These sums added to the $762,340 heretofore [519] allocated to general revenue make a total of $839,178 (less any proceeds from the front-footage tax).

 In addition to the budgeted surplus above referred to, there was during the 1954-1955 fiscal year unappropriated surplus on hands in the city treasury which is not reflected in the budget upon which the city's liability under § 84.730 was reckoned, and which relators insist must be included in such reckoning.

In a stipulation filed in this court subsequent to argument and submission of this cause, it is shown and admitted that in fact (as distinguished from the estimate in the budget) there was for the fiscal year of 1954-1955 "unappropriated surplus" in the city treasury allocated under the city's aforesaid charter provisions, as follows: General Fund, $1,666,971; West Park Fund, $125,309; East Park Fund, $88,458; Street Repair and Maintenance Fund, $237,052; and Market Fund, $292,494. Total, $2,410,284. Of this total, $1,941,042 was actually appropriated and expended prior to the end of the fiscal year.

At the hearing before the Special Commissioner, Mr. Porter Homer, Director of Research of the Budget of Kansas City, testified: At the beginning of the fiscal year, the council does not appropriate all of its unappropriated surplus, because the city has a better credit rating if it has financial reserves. But it is generally thereafter appropriated in regular course. Appropriations are made on a yearly basis and when savings from prior appropriations and income from under-estimated collections have been put into an unappropriated surplus fund they are subject to appropriation without reservation as to purposes for which they may be spent. In the past, the police department has received some

appropriations from surplus funds, but not on the basis of one-sixth thereof. If the council believed an appropriation necessary for the police department, it made the money available out of unappropriated surplus.

We think it clear that the actual amount of such funds available to the city during the fiscal year (less any moneys accruing from the front-footage tax), rather than the priorly estimated amount thereof, should be considered current revenue for the purpose of reckoning the city's liability under § 84.730. "Current revenue", as stated, means income from any source that is or will be at hand and currently available for public use. State ex rel. Thompson v. Board of Regents, 305 Mo. 57, 264 S.W. 698, 700. See also Greenhalgh v. Woolworth, 361 Pa. 543, 64 A. 2d 659, 664 [6]; Public Market Co. of Portland v. City of Portland, 171 Ore. 522, 130 P. 2d 624, 643-645. As unappropriated surpluses came into the treasury or became freed of any charge, trust or pledge to special use during the fiscal year, they became available for appropriation and were appropriated to such general public use as the council decided.

Section 84.730 does not fix the basis of the city's liability at one-sixth of the *anticipated or the levied* general revenue of the fiscal year, but at "one-sixth of the general revenue *fund* of such year". There can be no gainsaying the fact that the "general revenue fund of such year" is made up and consists of (1) general revenue funds on hand in the city's treasury at the beginning of "such year" plus (2) general revenue becoming currently available for appropriation during "such year". Therefore, such portion of unappropriated surpluses as is allocable to general revenue became a part of the city's "general revenue fund" for the fiscal year beginning May 1, 1954, and must be included in reckoning the city's liability under § 84.730. Indeed, we do not understand respondents to contend otherwise; they seem only to differ with relators as to what portions of such surpluses are allocable to general revenue. To hold otherwise would enable the city to deprive the police department of its needs by deliberately underestimating or over-appropriating each year's available revenue, and thus also to "both have thy cake and eat it" by thereafter bringing the resulting surplus funds back into its treasury balance without liability under § 84.730.

[520] The total of all surplus funds in the General Fund, West Park and East Park Funds, Street Repair and Maintenance Fund and the Market Fund, as shown by the stipulation, is $2,410,284. Of this amount we have priorly in this opinion allocated $839,178 (the portion thereof initially estimated) to the general revenue fund, leaving for consideration the balance of $1,571,106 (the portion actually received in addition to the estimated amount), none of which is devoted to any constitutionally or legislatively authorized special fund, and

all of which, therefore, is allocable to the general revenue fund under § 84.730 (except any proceeds from the front-footage tax).

 Relators' final exception relates to an item of $544,300 appearing in the January 1, 1954, estimate of revenues (Exhibit 2) to the credit of the General Fund, which relators contend should be allocated to the general revenue fund under § 84.730. It (the item of $544,300) was transferred to the General Fund from the Revolving Public Improvement Fund. The Special Commissioner did not include it in making his computations of the city's liability for the reason, he concluded, it did not represent revenue received by the city but was an amount transferred from another fund pursuant to an accounting practice of the city. The respondents' brief does not mention the item at all.

The testimony of Mr. Homer was: The Revolving Public Improvement Fund was established in 1926 and was largely maintained throughout the years by contributions from the General Fund, totalling in excess of $2,000,000, through the fiscal year ending 1953-1954. These funds were used for the purchase, among other things, of heavy equipment or structures, such as bulldozers or depots, for the use of the various departments. Unused portions of such funds, plus, it seems, certain rental charges paid on the equipment by the departments using it, would be returned to the general fund. Refunds to the general fund from 1944 through 1953-1954 totalled $809,857. The 1954-1955 contribution will nearly exhaust the Revolving Public Improvement Fund, whose function has been taken over by another fund. The amount of the transfer is large, not a normal occurrence. The council could use all or any part of the Revolving Public Improvement Fund that comes back into the General Fund for any general purpose.

The mere fact that the amount of money coming back into the General Fund from the Revolving Public Improvement Fund during the fiscal year of 1954-1955 is unusually large does not and cannot amount to a "windfall" such as might unjustly enrich the police department beyond its estimated needs at the expense of the city. By the express provisions of § 84.730, the department is limited in its demands to a "sum of money which will be necessary for the next fiscal year." We must presume the members of the police board have complied with their oaths of office. And, too, although the city may challenge any item of the department's estimate here involved as not being authorized by law, it has not done so. There is, therefore, no such an issue here. We can see no distinction between funds that were returned from the Revolving Public Improvement Fund to the General Fund and any other surplus that goes back to the General Fund. We hold that said item of $544,300 must be allocated to the general revenue fund under § 84.730.

We now consider respondents' objections to the report of the Special Commissioner.

 Respondents first insist that the Special Commissioner erred in "not excluding the cost of street lighting, sinking fund obligations, police and firemen's pensions, FICA contributions (social security), costs of election and the portion of the contingent fund from the revenues held to be appropriable for state purposes."

Section 84.730 requires that the appropriation for the police department be "payable out of the revenue" of the city, after first having deducted the amount necessary [521] to pay the interest on the indebtedness, the amount necessary for lighting costs, and any sum required to be placed to the credit of the sinking fund. This does not mean that the revenues available for the upkeep of the police department be diminished by the amount required to pay interest, lighting costs or sums to be placed in the sinking funds, unless the total of city funds is insufficient to defray both police maintenance costs and the specific items mentioned in the statute. The purpose and effect of the above provision is merely to give interest charges, street lighting costs and sinking funds priority of allowance and payment. Obviously, this provision can be a matter of concern only if and when insufficient provision is made or there are insufficient revenues with which to pay both the upkeep of the police department and the aforesaid preferred items of the city's upkeep. There is no issue here on that score. The contention is overruled.

 *Item 27,* designated in the report as "Municipal and Platte County Airport Receipts", amounts to $443,095. Of this item the Special Commissioner said: "This revenue is income to the city. It is required to be placed in the general fund by the charter. It is not required to be devoted to a special purpose. This revenue * * * is a part of the general revenue fund of the city." The evidence discloses that *in July of 1954* the city, under constitutional authorization, pledged said receipts to the payment of revenue bonds.

Respondents say: "Section 27, Article VI of the Constitution, empowers the City to issue airport revenue bonds and pledge the revenues of the airport as security for the bonds, All of the revenues of the City's airport are so pledged. * * * Revenues so pledged are in the nature of a trust fund. They fall within the protection of the Fourteenth Amendment of the Constitution of the United States." Relators' brief says that "airport revenues would have been authorized by constitutional provision (Art. VI, § 27, Const. of Mo.) to be devoted to a particular public use if they had been hypothecated prior to May 1, 1954, * * *. But these revenues were not so hypothecated until July of 1954, and were orginally commingled with other income allocated to the city's General Fund."

It is obvious that funds of the city which were unpledged prior to the date the board of police commissioners certified its needs to the city council and prior to the beginning of the fiscal year (May 1, 1954) cannot be excluded from general revenue in reckoning the city's

liability under § 84.730. In State ex rel. Reynolds v. Jost, 265 Mo. 51, 85, 175 S.W. 591, 598, this court said: "We can only say to those officers of Kansas City that the law points to them the way. It requires the police commissioners to make their estimate and demand at the beginning of your fiscal year. If that demand is within the law, you are then in position to meet it. At the time the law requires it to be made, you have before you the whole city loaf to be cut and distributed. The law says that, at the instance of the sovereign state, you must cut a certain slice of that loaf for police protection to your citizens and the other citizens of the state. You then had it within your power to meet the demands of the law. If the law is a harsh one, go to the Legislature."

*Item 24*, designated as "City Hall Rents and Concessions", amounts to $37,970; *Item 25*, designated as "Municipal Auditorium Receipts", amounts to $258,100; *Item 26*, designated as "Net Rentals from Veteran's Housing Project", amounts to $75,000; *Item 28*, designated as "Grandview Airport Receipts", amounts to $670. The Special Commissioner found that each of these items constituted revenue of the city, was required by the charter to be placed in the general fund, and was allocable to general revenue funds under § 84.730.

Respondents do not challenge the Commissioner's finding that these items were revenue coming into the city's treasury and were required by its charter to be placed in [522] the General Fund. They do contend however that each and all of said items are local in character and exempt from appropriation for state purposes, citing in support thereof: State ex rel. Kansas City v. Field, 99 Mo. 352, 12 S.W. 802; Kansas City ex rel. North Park Dist. v. Scarritt, 127 Mo. 642, 29 S.W. 845; Kansas City v. Marsh Oil Co., 140 Mo. 458, 41 S.W. 943; In re East Bottoms Drainage & Levee District, 305 Mo. 577, 259 S.W. 89; State ex rel. Gass v. Gordon, 266 Mo. 394, 181 S.W. 1016; 62 C.J.S., Mun. Corp., § 183, p. 339, to § 191, p. 350; McQuillin on Municipal Corporations, Vol. 2, p. 151, § 4.85, §§ 4.89 et seq.

We have carefully read each of the above cases. None is in point. The first three hold that where a city's charter contains a code of procedure for the exercise of its legislatively granted power of eminent domain, such code shall take precedence over general statutory provisions relating to the same subject matter. The case of In re East Bottoms Drainage & Levee District, supra, holds that the establishment of sewer districts was a matter of local or municipal concern. State ex rel. Gass v. Gordon, supra, a long and involved case, deals with the meaning of the word "revenue" as applied to a school law set forth in Laws 1915, p. 89, § 1. Respondents do not refer us to a word in any of these cases that sheds any light upon the issues here involved and, after careful search, we have found none. The citation from McQuillin is not helpful to respondents.

The proper maintenance of an adequate police system in Kansas City is a matter of state concern. State ex rel. Reynolds v. Jost, 265 Mo. 51, 67, 175 S.W. 591, 593. See also Van Gilder v. City of Madison, 222 Wis. 58, 267 N.W. 25, 105 A.L.R. 244, and ann. at p. 259. The fiscal affairs of a municipality such as Kansas City are subject to such legislative control as is necessary to the proper enforcement of matters of general state concern. 62 C.J.S., Mun. Corp., § 193, p. 352. Home rule constitutional provisions "do not prevent the legislature from imposing a duty on a municipality which will result in the creation of a debt to be met by local taxation where the duty or debt imposed is not for local or corporate purpose but arises from the performance of a function which a municipal corporation performs in its governmental capacity as an agency of the state." 62 C.J.S., Mun. Corp., § 194, p. 355. In State ex rel. Hawes v. Mason, 153 Mo. 23, 52, 54 S.W. 524, 531, we said: "The query of learned counsel for the auditor, 'Has the general assembly the further power to require such appropriation to be made in preference to appropriations for other equally necessary departments out of any revenue of such cities, as is attempted by the 13th section of the Act of March 15, 1899?' is unhesitatingly answered in the affirmative." The phrase "any revenue of such cities", as used in the foregoing quotation, must be construed to mean current income from whatever source the city may derive it which is subject to appropriation for public use. State ex rel. Thompson v. Board of Regents, 305 Mo. 57, 264 S.W. 698, 700. We hold that the revenues derived by the city as described in Items 24, 25, 26 and 28 were by the Commissioner properly allocated to the general revenue fund under § 84.730.

(It was upon the basis above set forth that we held as untenable respondents' contention that on account of $350,000 of Item 84 (Prior Years' Revenue) being "derived from activities local in character" it was exempt from allocation to general revenue under § 84.730.)

 *Item 29,* designated in the record as "Park Property Rentals and Concessions", amounts to $31,500; *Item 30,* designated in the record as "Rental of Miscellaneous City-Owned Property", amounts to $50,120; *Item 31,* designated as "Rentals and Concessions", amounts to $16,950. Respondents claim each of these items represents earnings from municipal or local activities and are exempt from appropriation [523] for state purposes. We have hereinabove considered that contention as to other items of a kindred nature (city hall rents and concessions, municipal auditorium receipts, etc.) and ruled it adversely to respondents.

 *Items 46 through 59* amount to $952,300. The Special Commissioner held that all of them were allocable to the general revenue fund under § 84.730. Respondents contend he erred in so holding for the reason that the revenue is derived from the exercise of police power or from activities local in character.

By reference to the schedules hereinabove set forth, it will be seen that these items relate mainly to income accruing to the city for so-called "governmental services" (such as notary and recording fees, court costs, etc.) ; street cuts and backfills; tow-in charges and services; recreation facility fees; public health, welfare and hospital services; inspection fees in connection with public safety; burial and cemetery services, et cetera.

- We have heretofore adversely ruled respondents' contention that income received from activities local or municipal in character is exempt from allocation to the general revenue fund under § 84.730. But respondents now say that certain of the income included in Items 46 through 59 comes to the city in payment of services rendered by the city in the exercise of its police power, such as license fees for the regulation of motion pictures, carnivals and other enterprises. They. say that the city is authorized by law to collect fees for regulation and that such fees are not taxation and should not be subject to appropriaion for state purposes, citing Kansas City v. School District of Kansas City, 356 Mo. 364, 201 S.W. 2d 930, 932; and Viquesney v. Kansas City, 305 Mo. 488, 497, 266 S.W. 700, 702 [3-5]. The above cases hold that the city has the power to charge fees for regulation of certain enterprises under its police power, but, as we read them, they do not announce any doctrine that would justify a conclusion that the state cannot include such fees in reckoning the city's liability under § 84.730.

Respondents also say of the street cut repair and backfill fees and gas inspection fees that they are less than the expense of the services rendered and are not revenue; that they reimburse a fund. We think they reimburse no fund that has constitutional or legislative authorization for its existence so as to deprive what otherwise is general revenue as contemplated under § 84.730. They are placed in the general funds of the city and are used for general purposes. The objections made by respondents to the allocation of Items 46 through 59 to the general revenue fund are overruled.

 *Item 9*, designated "Revenue from Other Street Uses", amounting to $42,000, was allocated by the Special Commissioner to general revenue. Respondents say that part of the money in this item is derived from charges made for permits to "dig up" streets which are usually insufficient to pay the cost of restoration, and that part of it comes from loading zone permits; that the fees from street digging charges are local in character and that the fees from loading zone permits originate from an exercise of the police power; and that, therefore, neither is to be allocated to general revenue under § 84.730. We have hereinabove ruled both contentions adversely to respondents.

 *Item 20*, designated as "Dog Licenses", amounting to $42,-000, was allocated to general revenue by the Special Commissioner. Respondents object upon the ground such licenses are exacted for a

local activity and under the city's police power. Both grounds are ruled adversely for reasons hereinabove stated.

*Item 7,* designated as "Parking Meter Receipts", amounting to $115,000, was by the Special Commissioner allocated to general revenue. Respondents say that "should it be held that the parking meter [524] receipts derive from the police power, then a situation is presented which is somewhat different from other police power fees. Parking meter receipts are substantially more than the cost of maintaining the meters and collecting the money. For the fiscal year in question, the cost of collection and maintenance was estimated at $25,000, and the amount to be collected at $115,000. If this gross amount is revenue appropriable for state purposes, at least the cost of the machines should be deducted. Since our parking meters have already been paid for, that cost is no longer an issue, but the principle should be declared."

The proper allocation of this item is not dependent upon whether it represents, or will represent, profit or loss from an activity of the city or whether it is income from a local or police activity; it is an amount that the city estimates will come into its general fund from parking meters during the fiscal year. Concededly, it is placed in the city treasury for general use; it is not devoted to any special use. Consequently, it constitutes a part of the general revenue fund under § 84.730.

*Item 61,* designated as "Municipal Farm Revenue", amounts to $363,600, of which $360,000, it is estimated, will be derived from livestock and poultry raised on the farm, and $3,600 of which will be derived from operation of a dog pound thereon. The municipal farm is owned and operated as a correctional institution for the confinement and useful occupation of prisoners. The entire sum was by the Special Commissioner allocated to general revenue. Respondents say (in addition to contentions heretofore ruled against them) that if the court should hold that the income from the farm arises out of an exercise of the police power, then the estimated cost of production, $205,346, should be deducted. Suffice it to say that the gross income anticipated from municipal farm operations was allocated by the city to the general fund. The entire fund goes into the treasury as current revenue for general use and is not devoted to a special use. Consequently, it must be treated as a part of the general revenue fund under § 84.730.

*Item 71,* designated as "Contribution from Starlight Theater Association", amounts to $15,000. Of it the Special Commissioner said: "Item 71 is revenue received from the Starlight Theater Association as repayment of a loan which the city made to the association some time prior to the preparation of the budget for the fiscal year 1954-1955. Regardless of the character of this revenue, it is income to the city which is not required to be devoted to a special purpose or paid into a special fund, and this revenue ($15,000) is a part of the general

revenue fund of the city." Respondents say it is not revenue, but repayment of a loan and that it is a local park activity and is therefore exempt. We hold that it definitely constitutes a part of the general revenue fund under § 84.730.

■ *Item 72*, designated as "Sale of City Real and Personal Property", amounts to $22,150. The city had allocated $16,000 thereof to the general fund and $6,150 thereof to park funds. The entire sum was by the Special Commissioner allocated to general revenue, on the ground that no part thereof is required to be devoted to a special use. Respondents contend it is not revenue and that $6,150 should be allocated to park funds. For the reasons hereinbefore stated, we hold that all of the fund inures to the general fund and is a part of the general revenue fund under § 84.730.

■ *Item 73*, designated as "Miscellaneous Non-Revenue Receipts", amounts to $12,100. It consists of amounts recovered from insurance on fire losses, unclaimed moneys, recovery of damages to city property and like sources. The Special Commissioner allocated the sum to general revenue. Respondents say none of this money is revenue; that it reimburses an original fund and that the amount of insurance is far less than the insurance premiums. The money is clearly a part of the general revenue fund of 1954-1955, and as such is allocable under § 84.730.

■ [525] In addition to ruling the objections of the parties to the foregoing challenged findings of the Special Commissioner, we have considered and approved as correct his unchallenged findings. We, therefore, tabulate and total such findings for the purpose of assessing the extent of the city's liability for support of its police department under § 84.730 for the fiscal year beginning May 1, 1954, as follows:

| Source of Revenue | | | General Revenue Fund | Not General Revenue Fund |
|---|---|---|---|---|
| Item | 1 | General Property Taxes | $7,617,147 | $ 293,874 |
| | 2 | General Property Taxes | —— | 3,505,746 |
| | 3 | Special Park Levies | 54,474 | 274,006 |
| | 4 | Cigarette Stamp Taxes | 1,055,556 | —— |
| | 5 | Gasoline and Motor Fuel Tax | 1,757,239 | 162,761 |
| | 6 | Vehicle Licenses | 727,500 | 22,500 |
| | 7 | Parking Meters | 115,000 | —— |
| | 8 | Taxicab Driver's Licenses | 4,500 | —— |
| | 9 | Other Street Uses | 42,000 | —— |
| Items | 10-23 | Licenses, Franchises | 6,570,430 | —— |
| | 24-26 | Rentals | 371,070 | —— |
| | 27-28 | Airport Receipts | 443,765 | —— |
| | 29-31 | Rentals and Concessions | 98,570 | —— |

| | | | | |
|---|---|---|---|---|
| | 32-35 | Interest | 80,000 | 311,454 |
| | 36-45 | Public Market | 144,550 | —— |
| | 46-59 | Service Charges, Fees, etc. | 952,300 | —— |
| Item | 60 | Sale of Insurance | —— | 35,000 |
| | 61 | Municipal Farm | 363,600 | —— |
| Items | 62-66 | Water Fund | —— | 5,592,523 |
| | 67-69 | State and Federal Grants | —— | 524,150 |
| Item | 70 | Federal Payment in Lieu of Taxes | 3,520 | —— |
| | 71 | Starlight Theater | 15,000 | —— |
| | 72 | Sale of Property | 22,150 | —— |
| | 73 | Miscellaneous Receipts | 12,100 | —— |
| Items | 74-81 | Working Capital and Public Works Working Capital Funds | —— | 1,176.094 |
| Item | 82 | Reimbursable Services | —— | 404,641 |
| | 83 | Collections from Assessments | —— | 174,500 |
| | 84 | Estimated Prior Years' Revenue | 839,178 | 184,711 |

(less any proceeds from the front-footage tax)

Unappropriated Surplus over and
above such surplus as above
estimated $1,571,106
 (less any proceeds
 from the front-
 footage tax)

Contribution from Revolving Public
Improvement Fund 544,300 ——

 $23,405,055 $12,661,960

[526] One-sixth of the general revenue fund (subject to reduction to the extent of any front-footage tax proceeds therein) for the fiscal year of 1954-1955 amounts to $3,900,842.50. The city has denied liability in excess of $3,551,354. Under § 84.730, the city's potential liability remains undischarged to the extent of the difference between these two sums, to wit: $349,488.50. But a practical matter yet remains to be considered in determining the extent to which mandamus will lie. This cause was submitted to this court on May 11, 1955. The issues deal with the share of public moneys of Kansas City to which the police department was entitled during the fiscal year ending May 1, 1955. No amount of money here awarded can now affect the efficiency of its operation during that period. Under such circum-

stances, it would be unjust to award any judgment in excess of the amount lawfully required by relators to discharge outstanding obligations of the department for which requisitions were lawfully issued as provided in § 84.780. The alternative writ of mandamus is therefore made peremptory to the extent only that respondents cause to be appropriated and paid to relators out of any money in the city treasury not appropriated to the specific purposes enumerated in § 84.730, any amount not exceeding $349,488.50 (less any front-footage tax proceeds therein) for which the police department remains legally liable and for which it issued timely requisitions as provided in § 84.780. All costs are taxed against respondents.

*Leedy, C.J., Dalton* and *Westhues, JJ.,* concur; *Storckman, J.,* concurs in separate concurring opinion, in which *Leedy, C.J., Hollingsworth* and *Westhues, JJ.,* concur; *Hyde, J.,* concurs in part and dissents in part in separate opinion; *Eager, J.,* concurs in part and dissents in part, and concurs in separate opinion of *Hyde, J.*

STORCKMAN, J. (*concurring*).—Another persuasive indication that surplus funds in the city treasury and unexpended funds from previous years were intended to be included in calculating "the general revenue fund of such year" is found in statutes comprising the county budget law. Section 50.670 provides that whenever the term "revenue" is used in the county budget law it "shall be understood and taken to mean the ordinary and general revenue to be used for the current expenses of the county * * * *regardless of the source from which derived.*" The section further provides that the county court shall prepare a "budget of estimated receipts and expenditures" and that "the receipts shall show the *cash balance on hand* as of January first and not obligated, also all revenue collected and an estimate of all revenue to be collected, also all moneys received or estimated to be received during the current year." Thus it appears that the General Assembly intended that county budgets should be prepared so as to include surplus funds or funds appropriated but not used in previous years as well as current receipts and income. While the definitions and procedures provided in § 50.670 are limited to the county budget law, we may take into consideration statutes involving similar or related subject matter when such statutes shed light upon the meaning of the statute being construed, unless we are expressly prohibited or a contrary intention plainly appears. State ex rel. St. Louis Police Relief Ass'n. v. Igoe, 340 Mo. 1166, 107 S.W.2d 929, 934; 16 C.J.S. 60, § 19b.

The governing body of Kansas City is required by the terms of the statute to appropriate for the use of the police board "the sum of money which will be necessary for the next fiscal year, to enable said board to discharge the duties * * * imposed upon it, and to meet the expenses of [527] the police department." However, the amount so appropriated shall not exceed one-sixth of "the general revenue fund

of such year." § 84.730 V.A.M.S. If the sum so appropriated was payable immediately and without further limitation to the police board so that the board could build up surplus funds and maintain a reserve, the contention that the one-sixth limitation should apply only to current income of the city would be more plausible. However, the board is only authorized "to requisition semimonthly upon the chief finance officer of the city *such sum, within the limits of the annual appropriation, as may be necessary for that period,* which sum shall be allocated by said officer and placed to the credit of the police department." § 84.780 V.A.M.S.

The statutes contemplate that the police board will budget its needs on an annual basis and to hold that the board is entitled only to one-sixth of the current receipts and income when collected would be a departure from the legislative theory and plan. We find no clear expression of intention to exclude the cash on hand or surplus funds in calculating the "general revenue fund" for the purpose of determining the maximum appropriation. The terms used in statutes must be given their usual and ordinary meaning unless such construction will defeat the manifest intention of the statutory provision. O'Malley v. Continental Life Ins. Co., 335 Mo. 1115, 75 S.W.2d 837; 82 C.J.S. 639, § 329b. Whether the one-sixth limitation is too high or too low is a legislative matter and not for the courts.

For these additional reasons I concur in the opinion of the court.

SEPARATE CONCURRING AND DISSENTING OPINION

█ HYDE, J.—I cannot agree with the part of the principal opinion herein which holds that amounts not due to or received by the City during the year involved must be considered in determining the total amount to which the limitation of one-sixth, made by Sec. 84.730 RSMo., V.A.M.S. applies. It must be conceded that Sec. 84.730 is far from being clear and definite. However, it is my view that the reasonable construction of this limitation it specified, and the legislative intent of the statute, is that the Police Board budget (if it requires it) is entitled to one-sixth of all revenue (constituting general revenue) which the City receives or has due to it during the year involved; but that during the subsequent year it is not entitled to one-sixth of any funds derived from unexpended revenue received by the City in any prior year and carried over to be used later. In other words, I think the words, "one-sixth of the general revenue fund of such year", mean one-sixth of the fund derived from general revenue received by or due to the City during such year and no more. The words "of such year" are particularly significant; and the same idea is suggested by the words "payable out of the revenue of said cities" also found in Sec. 84.730.

I think this meaning is consistent with our long established constitutional plan of keeping all local finances on an annual basis. Ever since 1875 (Sec. 12, Art. 10, Const. 1875) we have had the provision that (without a two-thirds vote) no city or other local governmental unit shall become indebted "to an amount exceeding in any year the income and revenue provided for such year." The purpose of this is to prevent annual obligations from exceeding annual revenue. The Legislature, no doubt, had this financial system in mind when it passed the Kansas City Police Act in 1939 (Laws 1939, pp. 545, 559.) Sec. 24, Art. 6 of the 1945 Constitution contains the additional requirement that all local governmental units have an annual budget. Sec. 26(a) thereof now provides for considering unencumbered balances of previous years in determining how much such units become indebted in any year; and while savings from previous years may be spent by the City for any lawful purpose, they clearly do not constitute revenue provided for a subsequent year as shown by the separate reference to them in this constitutional provision. I cannot believe that the Legislature meant [528] by the language used in Sec. 84.730 that the Police Board was entitled both to one-sixth of all the general revenue of the City in the year for which it was provided and also during the next year to one-sixth of any surplus of revenue carried over from the year for which it was provided. In short, the Police Board is not entitled to one-sixth of any revenue twice.

As shown by the opinion herein, the City budget is prepared and approved at the beginning of the fiscal year and appropriations are made in accordance with this budget. The City gets a better credit rating if it has financial reserves and, therefore, the budget is intentionally underestimated. Of course, as the opinion properly holds, this underestimated amount has nothing to do with the total amount the Police Board is entitled to receive, if the full one-sixth of the revenue fund of the year is required to meet the Police Board budget, because it is entitled to one-sixth of the actual general revenue of the City provided for the year and not one-sixth of an estimated amount. Therefore, when, as in this case, the budget of the Police Board is greater then one-sixth of the actual general revenue of the year, the Board should first be given one-sixth of the estimated amount and later, as revenue in excess of the estimated amount comes in, the Board should be given additional appropriations up to the full amount of one-sixth of all revenue due the City for the year as it is received by it, even including one-sixth of delinquencies that are paid after the end of the year. However, surplus amounts, which the City has accumulated from not spending revenue due it in preceding years, are, in my view, no part of the general revenue fund of any subsequent year, as that term is used in Sec. 84.730. Therefore, if the Police Board was not entitled to one-sixth of such surplus of a previous year during such year (because its budget was not large enough during such year to

require it), or if it did get one-sixth of that surplus during such year, then in either event it is not entitled to any part of it during the year involved herein or any subsequent year.

To illustrate: if the actual general revenue due the City in the fiscal year of 1953 was $21,000,000.00, the Police Board was entitled to $3,500,000.00 if it needed it and made such a budget request. However, if the Police Board only requested $3,000,000.00 and for that reason the City had $500,000.00 surplus, which it did not spend but carried over to the next year, the Police Board would not be entitled to one-sixth of that amount in the 1954 fiscal year even if its 1954 budget was larger than one-sixth of the total amount of the actual revenue due to and received by the City during the 1954 fiscal year. Likewise, if in 1953 the Police Board asked for and got $3,500,000.00, but the City made a saving of $500,000.00 in the operation of other departments, the situation would be the same, namely: the Police Board could only get one-sixth of the actual revenue due to and received by the City during the 1954 fiscal year and would not in the next subsequent year be entitled to any part of the $500,000.00 surplus accumulated during the previous year. Otherwise, the Police Board would get a one-sixth part of the same fund not once but twice. Therefore, while I agree that, for 1954, the Police Board is entitled to one-sixth of the next to the last item, "unappropriated surplus over and above such surplus as above estimated—$1,571,106" (and any other additions to such surplus from revenue due in that year, if any), I do not agree that the Police Board is entitled to one-sixth of item 84, "estimated prior year's revenue—$839,178." Likewise, I do not agree that the Police Board is entitled to one-sixth of the last item, "Contribution from Revolving Public Improvement Fund—$544,300.00", because it is made up of revenue collected in preceding years; or of item 71, "Starlight Theater—$15,000.00", which was a payment of a loan of funds made from revenue of a previous year. If the legislative intent was in accordance with the construction made in this dissenting opinion, it could be made clear and definite by an amendment to Sec. 84.730. As to all other items and rulings, I concur in the principal opinion.

[529] *Eager, J.*, concurs.

## On Motion for Rehearing

**PER CURIAM:**—Respondents' motion for rehearing does not challenge our basic finding "that general revenue of the city which is devoted to special purposes or allocated into special funds by virtue of the city's charter (and ordinances) is to be included in reckoning one-sixth of the general revenue fund under § 84.730, unless such charter provisions or ordinances placing such funds to a special purpose or into special funds were enacted pursuant to express or clearly implied constitutional or statutory authority." But they do strenuously urge us to relieve them of the rigors of said statute by judicially legislating

exceptions to its provisions. In answer to this insistence, we must say, as we said in the original opinion, that is not our function. If, due to modern methods of municipal operation and financing, § 84.730 has become archaic or is oppressive, the problem is political and relief can be had only from the legislature; the courts are without jurisdiction in the premises.

Bearing these postulates in mind, we have given careful consideration to each of the assignments of respondents' motion and, with the exceptions hereinafter stated, have concluded that the motion should be overruled.

## I.

Respondents say that in "deciding that airport receipts (Items 27-28, $443,765), unpledged for the payment of revenue airport bonds prior to the date the Police Board certified its needs, could not be excluded from general revenue, the implication seems to be that if the revenue *is* pledged, under authority of Section 27, Article VI of the Constitution, it should be excluded. If this implication is warranted we respectfully suggest that the opinion be clarified."

The opinion does imply and, considered in its entirety, holds in effect that whenever revenues of the city are devoted or pledged to a special purpose or fund pursuant to express or clearly implied constitutional or legislative authority, as is the case with these funds, Items 27-28, then such funds must thenceforth throughout the succeeding years of their encumbrance be excluded from general revenue to the extent of the encumbrance in reckoning the city's liability under § 84.730.

## II.

Respondents call our attention to the failure of the original opinion to pass upon certain city expenditures in reckoning its liability under § 84.730. The opinion did overlook a paragraph in respondents' brief reading as follows:

"By direction of state statute, the City will contribute $341,000 to police and firemen's pension fund, by federal statute $150,000 to FICA (social security), and by state statute $193,548, to costs of elections. All of this money should be deducted from the fund appropriable for police purposes. Otherwise, to that extent, the City and its Citizens would be burdened with double taxation, and property would be taken without due process of law, in violation of Section I of the Fourteenth Amendment of the Constitution of the United States."

Of these items, respondents now say:

"In addition to the contribution to the Firemen's Pension Fund from vehicle licenses mentioned in Item 6 of the opinion, the City made additional contributions of $198,500.00 to the Firemen's Pension Fund, by the direction of the same Statute, Section 86.657, R.S.Mo. 1949, and, as well by direction of Section 86.653.

"By direction of Section 86.297, R.S.Mo. 1949, the City contributed to the Police Pension Fund the sum of $120,000.00.

"By direction of Section 117.140, R.S.Mo. 1949, the City contributed for elections, other than municipal, and for the maintenance of the Election Board, the sum of $193,548.00.

"By direction of Committee Substitute for Senate Bill No. 3, Laws Missouri, 1951, [530] Page 788, and particularly Section 4(1) Page 793, and in compliance with a contract authorized thereby between the City and the Division of Budget and Comptroller of the State of Missouri, * * * the City contributed to the FICA (Social Security) Fund the sum of $182,749 for employees employed in departments the revenues of which you hold to be General Revenues."

It is to be noted that respondents have abandoned their contention of double taxation and deprivation of due process, and now resort to the provisions of certain statutes.

Section 86.297 does require the city to make contributions of portions of its revenue to the police pension fund and it is clear, therefore, that any contributions made by the city in accordance with said statute should be excluded from general revenue under § 84.730, and we so hold. Section 86.657 authorizes the city to set aside certain portions of its revenues for pensioning its firemen and certain of their dependents. Section 86.653 creates the fire department pension fund and requires, among other things, that all moneys received by the city from certain sources shall be paid into that fund. It is clear that any payments made by the city in accordance with these statutes should be excluded from general revenue under § 84.730, and we so hold.

Any moneys paid out by the city for its share of the salaries and expenses of the Board of Election Commissioners for the conduct of elections (which includes general, special and primary elections, unless otherwise specified, § 117.010) under the provisions of § 117.140 are but a general charge upon the city in the course of its operation, payable out of general revenue. No special fund is created nor is any of the general revenue of the city "earmarked" for such purpose. Hence, such payments are not to be excluded in reckoning the city's liability under § 84.730, and we so hold.

A different situation exists, however, with regard to payments made by the city under Laws 1951, pp. 788-796, §§ 105.300 to 105.460, V.A.M.S., relating to social security. Under that Act, when put into operation by the city, the city is required to pay into a contribution fund, by such Act created in § 6 (105.390) thereof, certain moneys; and it is further required that such funds be kept separate from other public funds. It seems clear, therefore, that funds allocated by the city to and paid into such fund should be excluded from general revenue under § 84.730, and we so hold.

402

## III.

Respondents say that through error not chargeable to the court there was a duplication of figures in an exhibit on which Item 84, Estimated Prior Years' Revenue, was computed, which, on its face, subjected $496,967 to "two appropriations * * * from this particular amount of money". They also say that through error not chargeable to the court substantially one-half of an item of $45,485 should have been excluded from the general revenue fund. These matters are now immaterial and moot. It is conceded, as we understand, that the police department operated during the fiscal year ending May 1, 1955, within the funds appropriated for its maintenance and, due to express limitations placed upon the peremptory writ ordered issued herein, actually will take nothing, other than its costs, under the judgment rendered. Consequently, respondents cannot be hurt by the duplication or the other erroneous addition to general revenue referred to. To further consider them can be of no aid to any one.

## IV.

In holding that actual surpluses available during any fiscal year rather than prior estimates thereof should be considered current revenue for the purpose of reckoning the city's liability under § 84.730, we further said: "As unappropriated surpluses came into the treasury or became freed of any charge, trust or pledge to special use during the fiscal year, they became available [531] for appropriation and were appropriated to such general public use as the council decided."

Respondents say that the quoted language may be interpreted to mean that the police department would be entitled during such year to one-sixth of any such surplus becoming available during the fiscal year even though it had been allowed one-sixth thereof earlier in the same year. Such language is, of course, not to be so interpreted. Any such surplus becoming available during the fiscal year would be reckoned in computing the city's liability for such year only when it came from funds not included in the original estimate. And that is precisely what we did in computing the liability of the city under § 84.730, as our opinion, when read, will reveal.

The opinion is modified to the extent above set forth and the motion for rehearing is overruled.