STATE of Missouri ex rel. ST. LOUIS COUNTY, Missouri, et al., Relators,

v.

Ninian M. EDWARDS et al., Circuit Judges of the 21st Judicial Circuit of the State of Missouri, Respondents.

No. 60914.

Supreme Court of Missouri, En Banc.

Nov. 14, 1979.

Rehearing Denied Dec. 6, 1979.

Thomas W. Wehrle, George W. Lang, II, Clayton, for relators.

Shulamith Simon, Mark G. Arnold, St. Louis, for respondents.

WELLIVER, Judge.

This is an original proceeding in the nature of quo warranto instituted by the St. Louis County Supervisor and the acting Director of Welfare of St. Louis County, Missouri, against the circuit judges of the 21st Judicial Circuit. Relators seek to oust respondents from usurping relators' alleged authority to control "all children's buildings, all places of detention and correction for children, and other County child welfare institutions," and to "provide for such personnel in both the administration and detention departments of the Juvenile Court of St. Louis County under the County Merit System as may reasonably be necessary to properly carry on the functions of that Court." Relators allege that they have the authority to control the juvenile detention facilities by virtue of Art. IV, § 4.410(3) of the 1968 Charter of St. Louis County and Mo.Const. art. VI, § 18, despite the provisions of §§ 211.161 and 211.331, RSMO 1978 to the contrary. Relators base their claim

of right to control the juvenile court's employees on *State on inf. Anderson ex rel. Weinstein v. St. Louis County,* 421 S.W.2d 249 (Mo. banc 1967) and *State on inf. Anderson ex rel. Weinstein v. St. Louis County,* 451 S.W.2d 99 (Mo. banc 1970). We find respondents in this case to be innocent of any usurpation of, intrusion into, or unlawful holding and executing of an office or franchise as alleged in relators' information, and quash the writ of quo warranto.

Relators filed this information in the nature of quo warranto on August 1, 1978, and on September 12, 1978, this Court issued its order to respondents to show cause why they should not be ousted from the exercise of control over juvenile detention facilities and from providing for such personnel as may be reasonably necessary to carry on the functions of the juvenile court as prayed in the information. Respondents filed an answer denying that they are usurping any franchise properly belonging to relators. On January 15, 1979, this Court ordered the appointment of the Honorable Norwin D. Houser as Special Commissioner for the purpose of conducting a hearing, taking testimony, making findings of fact and conclusions of law, and reporting to this Court his recommendations as to final disposition of the issues, all pursuant to Rule 68.03 and Mo.Const. art. V, § 26. The parties agreed to a stipulation of the material facts and each party filed a memorandum and proposed conclusions of law with the Special Commissioner. In the report filed June 7, 1979, Special Commissioner Houser recommended that the order to show cause

> be quashed for failure of the stipulated facts to show that respondents are usurping, intruding into or unlawfully holding, exercising or executing privileges, rights, duties or lawful authority of relators with respect to the control and charge of the children's buildings, places of detention and correction for children and other county child welfare institutions, or with respect to the provision of personnel in the administration and detention departments of the Juvenile Court of St. Louis County.

The Special Commissioner further recommended that costs be assessed to relators. Exceptions to the report were filed by relators and overruled by the Special Commissioner and the case was docketed for hearing before this Court.

The parties stipulated to the following facts. Respondents currently exercise and at all relevant times have exercised control over the facilities involved: the Juvenile Center, the Lakeside Center for Boys, and two facilities known as the Group Homes. The Superintendent of the Juvenile Center is responsible to the Director of Court Services who in turn is under the control of the juvenile court judge. The appointment to juvenile court judge is rotated among the judges of the various divisions of the Circuit Court of St. Louis County. The juvenile court judge also controls and administers the Group Homes and sits on the Board of Directors of the Lakeside Center. Relator St. Louis County carries and pays premiums for fire, extended coverage and vandalism insurance on the buildings and contents of the Juvenile Center and the Lakeside Center and on the contents of the Group Homes.

The Juvenile Center, located at 501 South Brentwood, St. Louis, Missouri, was constructed with funds from a $5,000,000 bond issue approved by the voters of St. Louis County in 1969 and is equipped, operated and maintained with public funds of St. Louis County. Supplies for the Center are purchased through St. Louis County's Department of Administration, but respondents make decisions regarding such purchases. The Juvenile Center contains housing for juveniles in the custody of the Juvenile Court of St. Louis County and ancillary facilities, the juvenile court room and the administrative offices of the juvenile court, and facilities in which the juvenile court's diagnostic, educational, counseling and treatment programs are conducted, including the Shelter Care Unit, the General Educational Degree Program, Project L.E.A.R.N., and Psychological Services for Children.

The Lakeside Center for Boys, located at 13044 Marine Avenue, St. Louis County, Missouri, is a specialized residential treatment center for socially and emotionally disturbed boys with a high potential for improvement, who appear before the Juvenile Court of St. Louis County. The Lakeside Center was acquired and constructed with funds from an $800,000 bond issue approved by the voters of St. Louis County in 1955 and is equipped, operated and maintained primarily with public funds of St. Louis County, with funds for a small portion of expenses and for certain programs provided by private donors.

The Group Homes, located at No. 2 and No. 7 Concord Center Drive, and Darrow Hall, Rt. 1, Box 550, Cedar Hill, Missouri, are leased pursuant to St. Louis County ordinance. The funds to lease, equip, operate and maintain the Group Homes are exclusively public funds of St. Louis County. Prior to October 1, 1978, the federal government provided varying proportions of the funds used to equip, operate and maintain the Group Homes.

Fifty-eight of the 189 employees who serve the juvenile court and whose salaries are not funded under federal grants are covered by the St. Louis County Merit System, pursuant to agreement between the judges of the 21st Judicial Circuit and the St. Louis County Council. The employees covered by the county merit system have the following job classifications: clerk typist, licensed practical nurse, cook, head cook, court room security officer, maintenance man, custodial worker, food service worker and laundry worker. The remaining 131 employees are not covered by the St. Louis County Merit System, but are hired and terminated and their compensation is fixed by the juvenile court judge. These employees have the following titles or job classifications: Director of Court Services, Superintendent and Assistant Superintendent of the Juvenile Center, chief juvenile officer, deputy juvenile officer (social worker and social worker aide), institutional teacher, detention program director, detention caseworker, legal staff, and legal intern. Employees whose salaries are funded by federal grants are not included in the county merit system.

After the adoption of the St. Louis County Merit System on April 1, 1954, the employees serving the detention facility were brought under the county merit system, but the remaining employees serving the juvenile court were not subject to the merit system. Following this Court's decision in *State on inf. Anderson ex rel. Weinstein v. St. Louis County,* 421 S.W.2d 249 (Mo. banc 1967), all employees serving the juvenile court were placed under the Department of Public Welfare and were subject to the merit system. Following the subsequent decision in *State on inf. Anderson ex rel. Weinstein v. St. Louis County,* 451 S.W.2d 99 (Mo. banc 1970), all employees serving the juvenile court were eliminated from the Department of Welfare and were not subject to the merit system. Fifty-eight nonprofessional employees were then brought under the merit system when the above-mentioned agreement between the judges of the 21st Judicial Circuit and the St. Louis County Council was reached in settlement of a suit brought by clerical employees seeking to be included in the County Retirement Plan.

The instant dispute raises two questions: (1) whether the juvenile court has the right to control the physical facilities provided by the county for the detention and treatment of juveniles who are subject to the jurisdiction of the juvenile court; and (2) whether the juvenile court has the right to control the employees who provide services in carrying out the functions of the juvenile court. In the discussion that follows, the two questions are treated separately.

### I.

■ Relators contend that the St. Louis County Director of Welfare has the right to immediate control of juvenile detention and correction facilities, specifically the Juvenile Detention Center, the Lakeside Center for Boys, and the Group Homes. Relators base this contention on Art. IV, § 4.410(3) of the 1968 Charter of St. Louis County,

which provides that the director of welfare shall have the power and duty to "[h]ave control and charge of all children's buildings, all places of detention and correction for children, and other county child welfare institutions." This charter provision directly contradicts §§ 211.161.3 and 211.331.3, RSMo 1978, which expressly place the control of such facilities in the juvenile court.[1] The question for determination thus becomes whether the provisions of the St. Louis County Charter relating to control over juvenile facilities takes precedence over the provisions in the Juvenile Code relating to such control. The answer depends on whether the control of juvenile detention facilities is a matter which is within the province of general legislation involving the public policy of the state as a whole. *Flower Valley Shopping Center v. St. Louis County*, 528 S.W.2d 749, 754 (Mo. banc 1975); *State ex rel. Spink v. Kemp*, 365 Mo. 368, 283 S.W.2d 502, 514 (banc 1955).

Missouri's Juvenile Code, Chapter 211, RSMo 1978 establishes a comprehensive statutory framework for the treatment of juveniles coming within its jurisdictional provisions. The Juvenile Code endows the juvenile court with numerous powers. The Code provides that the juvenile court shall have exclusive jurisdiction in proceedings involving children who are alleged to have violated a state law or municipal ordinance. § 211.031.1(2);, RSMo 1978. The Code provides that the juvenile court may, in general, retain jurisdiction over a child until the child attains the age of twenty-one for the purpose of facilitating the child's care, protection and discipline. § 211.041, RSMo 1978. The juvenile court may order that a juvenile who is taken into custody for violation of law or ordinance be detained pending disposition of the case, provided the court specify the reason for detention. § 211.141, RSMo 1978. The Code gives the juvenile court the authority to commit a child to the custody of a public or other agency or institution legally authorized to care for children, or to the custody of an association, school or institution in another state on the approval of the appropriate agency in that state, or to the custody of the juvenile officer. § 211.181(2), RSMo 1978. The juvenile court may suspend any of its orders and place the child on probation as it deems reasonable. § 211.181(6), RSMo 1978. All commitments made by the juvenile court shall be for an indeterminate period of time, not to continue beyond the child's twenty-first birthday. § 211.231, RSMo 1978. The Juvenile Courts Chapter is to be liberally construed to effectuate its purpose. § 211.011, RSMo 1978.

As part and parcel of this statutory framework, the Code provides that "medical, psychiatric and other facilities . . . shall be under the administration and control of the juvenile court." § 211.161.3, RSMo 1978. Detention facilities must be provided in first and second class counties by the county court or other authorized body, so located and arranged that a child never comes into contact in any manner with convicted or arrested adults. §§ 211.331.1 and 211.331.2, RSMo 1978. As noted above, "[t]he place of detention shall be in charge of a superintendent" who is appointed by the juvenile court and whose compensation is fixed by the juvenile court. § 211.331.3, RSMo 1978. The General Assembly considered placement of control of juvenile facilities in the juvenile court to be so important to the achievement of the

---

1. Section 211.161.3, RSMo 1978 provides:

A county may establish medical, psychiatric and other facilities, upon request of the juvenile court, to provide proper services for the court in the diagnosis and treatment of children coming before it and these facilities shall be under the administration and control of the juvenile court. The juvenile court may appoint and fix the compensation of such professional and other personnel as it deems necessary to provide the court proper diagnostic, clinical and treatment services for children under its jurisdiction.

Section 211.331.3, RSMo 1978 provides:

The place of detention shall be in charge of a superintendent. The judge of the juvenile court shall appoint and fix the compensation and maintenance of the superintendent and of any assistants or other personnel required to operate the detention facility. Such compensation and maintenance are payable out of funds of the county.

purpose of providing care, protection and discipline of children coming within the juvenile court's jurisdiction that it made explicit provision for the juvenile court to control those facilities. The evident purpose of the Juvenile Code provisions in question is to insure that a single agency (the juvenile court) control and coordinate all aspects of juvenile treatment. We are convinced that the question of who is to control juvenile facilities is a subject of general legislation that involves the public policy of the state as a whole. "In general, the provisions of the Juvenile Act (Chapter 211) relate to state functions and are applicable to St. Louis County." *State on inf. Anderson ex rel. Weinstein v. St. Louis County,* 421 S.W.2d 249, 255 (Mo. banc 1967). Consequently, Art. IV, § 4.410(3) of the 1968 Charter of St. Louis County, which purports to override §§ 211.161.3 and 211.331.3, RSMo 1978 is without effect.[2]

Relators contend that Art. IV, § 4.410(3) of the 1968 Charter of St. Louis County should take precedence over the Juvenile Code, placing heavy reliance on *State on inf. Dalton ex rel. Shepley v. Gamble,* 365 Mo. 215, 280 S.W.2d 656 (banc 1955). In *Gamble,* this Court declined to oust the Department of Police of St. Louis County from performing the duties of law enforcement which, prior to adoption of a charter amendment in 1954, had been performed in St. Louis County by a sheriff. The Court determined that a sheriff is a county officer within the meaning of the constitutional provision that gives the county the right to provide in its charter "for the form of the county government, the number, kinds, manner of selection, terms of office and salaries of the county officers." Mo.Const. art. VI, § 18(b). The Court held that "provision must be made by the charter county for the performance of the duties enjoined upon sheriffs by our statutes, but the county has the choice as to what officer or agency will be designated to perform the duties." *Gamble,* 280 S.W.2d at 660.

The control of the facilities here in question is distinguishable in at least three ways from the question of the manner of provision of law enforcement services which *Gamble* determined to be a matter of local concern. First, there is clear support in the debates concerning Mo.Const. art. VI, § 18 in the Constitutional Convention for the view that although a county charter must provide some officer to enforce state laws, they "might call him anything." Mr. Mayer, 9 Debates of the Missouri Constitution 1945, pp. 2747–48; *Gamble,* 280 S.W.2d at 661. There is nothing in the *Debates* to support the inference that a county might vary the control of facilities for juvenile care provided for in the Juvenile Code. Secondly, the Court in *Gamble* found statutory support for the conclusion that a sheriff was a "county officer" in § 57.080, RSMo 1949, which provided that vacancies in the office of sheriff shall be filled by the county court. Nothing in the Juvenile Code can be construed to give the county control over juvenile facilities. The third and most important distinction to be drawn is one suggested by the other two points: unlike the duty of law enforcement, which is placed on the county by our statutes, the duty of controlling juvenile facilities was never placed on the county but is placed on the juvenile court by the Juvenile Code. Control of the facilities in question by the county cannot be rendered consistent with these statutory provisions. Consequently, unlike charter provision for a county Department of Police, § 4.410(3) of the 1968 Charter of St. Louis County does much more than merely vary the manner of performing a duty which is already imposed on the county; it also attempts to arrogate to the county the duty to control juvenile facilities. The analogy sought to be drawn by relators to the situation in *Gamble* thus does not withstand analysis.

■ Relators have failed to show that respondents are usurping a franchise right-

**2.** *See Mashak v. Poelker,* 367 S.W.2d 625, 632 (Mo. banc 1963): "The statutory authority [of the juvenile judge to appoint and fix the compensation of the court's administrative assist-
ant under § 211.161.3, RSMo 1978] renders nugatory the contention that the expenditures are not authorized under the city charter."

fully belonging to the county. The requested ouster of respondents from control of juvenile facilities should be denied.

## II.

Relators seek to oust respondents from control of the employees of the juvenile court, and to bring those employees within the provisions of the county merit system established in Art. VII of the 1968 Charter of St. Louis County. The merit system provides "for the appointment of all county employees and appointive county officers . . . on the basis of merit ascertained as nearly as practicable by competitive examination and for the retention of said employees and officers on the basis of merit and ability." 1968 Charter of St. Louis County art. VII, § 7.010. The merit system provides a plan for classification of positions in which the compensation of the employees will be tailored to follow "the principle of equal pay for substantially equal work," and for the establishment of a civil service commission to establish pay plans, to set up job classifications, and to hear appeals in cases of disciplinary actions by appointing authorities. *Id.*, §§ 7.010 and 7.030.

Relators base their claim to the right to control the juvenile court's administrative and detention facility employees on the conclusion reached in *State on inf. Anderson ex rel. Weinstein v. St. Louis County*, 421 S.W.2d 249, 255 (Mo. banc 1967) (hereinafter, *Weinstein I*). *Weinstein I* was an action in the nature of quo warranto challenging the legal authority of the St. Louis County Council to reduce budget estimates of the juvenile court without its consent. The Court held that such budget estimates could not be reduced without the consent of the circuit court. The Court also concluded that "the personnel provided for the assistance of the juvenile court are not judicial officers within the meaning of [Mo.Const.]

Art. VI, § 18(e), but are employees of the county." Based on this conclusion, *Weinstein I* held that the employees reasonably necessary to properly carry on the functions of the Juvenile Division of the Circuit Court of St. Louis County in either the administration or detention departments

> shall be expeditiously employed and their salaries fixed in accordance with the charter, rules, and ordinances applicable to the civil service commission and the merit system; [and] that the present employees serving the juvenile court are subject to the merit system and their salaries shall be fixed in accordance therewith and the estimates placed in the budget for said employees shall be in harmony with the salaries so fixed.

*Id.* at 255.

The finding of *Weinstein I* that the employees of the juvenile court were subject to the provisions of the St. Louis County Merit System, was subsequently overruled in *State on inf. Anderson ex rel. Weinstein v. St. Louis County*, 451 S.W.2d 99 (Mo. banc 1970) (*Weinstein II*). *Weinstein II* was an action in the nature of quo warranto challenging the legal authority of St. Louis County and certain county officials to determine the number of employees serving the administration and detention departments of the juvenile court, to select and control those personnel, and to fix their compensation. *Id.* at 101. Although *Weinstein II* nowhere makes explicit reference to the St. Louis County Merit System, it is obvious that the provisions of the merit system relating to the determination of the number of juvenile court employees, to the selection and control of such employees, and to the compensation to be paid such employees were directly affected by the decision.[3] The Court in *Weinstein II* determined that these functions were within the inherent power of the juvenile court:

> Our decisions do not disturb the agreement between the circuit judges and St. Louis County, by which clerical and nonprofessional employees of the juvenile court are now covered by the county merit system.

---

**3.** The county's own action, in promptly removing the juvenile court's employees from the county merit system in the wake of *Weinstein II*, belies relators' contention that *Weinstein II* is consistent with leaving the employees of the juvenile court under the county merit system.

We are of the opinion that within the inherent power of the Juvenile Court of St. Louis County, subject to the supervisory control of the Circuit Court of St. Louis County . . . [citations omitted] is the authority to select and appoint employees reasonably necessary to carry out its functions of care, discipline, detention and protection of children who come within its jurisdiction, and to fix their compensation. In order that the Court may administer justice under the Juvenile Code, it is essential that it control the employees who assist it.

*Id.* at 102. *Weinstein I* and *Weinstein II* read together, indicate that although Mo. Const. art. VI, § 18(e) prohibits the legislature from enacting laws affecting the number and salary of county employees other than judicial officers, the inherent powers of the court itself are not subject to the same limitations. "Inherent powers do not depend upon statutory authorization as their source." *State ex rel. Cain v. Mitchell,* 543 S.W.2d 785, 786 (Mo. banc 1976).

Relators argue that the application given the doctrine of inherent power in *Weinstein II* misinterprets the concept of "inherent power."[4] Relators cite the statement in *Weinstein II* that the doctrine of inherent power is to be invoked "only on occasions where necessary personnel and facilities are not provided by conventional methods," *id.* at 102, and contend that the merit system is the conventional method for the provision of administrative and detention employees. The language in *Weinstein II* on which relators place emphasis specifically relates to the failure of conventional sources to "provide necessary *funds." Id.* at 102. (Emphasis added.) This language certainly cannot be read out of context to negate the determination that the number, compensation, selection and control of juvenile court employees is within the inherent power of the court. To assert that the county's assumption of the control of the selection, discipline and physical conduct of the employees of the juvenile court does not encroach on the inherent powers of the juvenile court simply because the merit system is the "conventional method" of providing county employees is to miss the central point of *Weinstein II.* The court, and not the county, must have control of its employees, so that the county cannot "determine the extent to which the judicial department could perform its judicial functions. . . by limiting the number of employees, regardless of need, or by providing for no employees at all." *Id.* at 102.

▮ Relators contend that the supervision and maintenance of detention facilities and the supervision of the treatment and discipline of persons in custody is an executive and not a judicial function. Relators argue that the placement of control of the juvenile court's detention facilities and employees in the juvenile court therefore violates the separation of executive from judicial powers required by Mo.Const. art. II, § 1. This argument attempts to analogize the power to control juvenile facilities to the charter power to control the facilities for and treatment of adult prisoners in the county jail. Relators' contention ignores

---

4. Relators quote the statement made in *Ex parte Hughes,* 133 Tex. 505, 129 S.W.2d 270, 273 (1939) that "[u]nder our system there is no such thing as the inherent power ôf the court, if by that, be meant a power which the court may exercise without a law authorizing it." The quoted language does not aid relators in this case. It is clear that Missouri does recognize the concept of the inherent power of a court. *State ex rel. Cain v. Mitchell,* 543 S.W.2d 785, 786 (Mo. banc 1976); *Weinstein II,* 451 S.W.2d at 101–02; *Weinstein I,* 421 S.W.2d at 255; *State ex rel. Gentry v. Becker,* 351 Mo. 769, 174 S.W.2d 181, 183 (1943). *Hughes* involved the attempt to hold the habeas corpus petitioner in contempt of court for his refusal to produce records in an action brought by the state to enjoin usurious lending practices. The case held that the court had no jurisdiction to entertain the action underlying the contempt citation, and the relator was discharged. The language quoted from *Hughes* was directed toward rejection of the notion that a court has any inherent power to act beyond its constitutional and statutory jurisdiction. No such question of jurisdiction is presented here. The question of whether the juvenile court has the inherent power to control administrative and detention personnel is distinct from questions relating to the scope of its jurisdiction under § 211.031, RSMo 1978.

the vast difference between the theory and purposes of the juvenile court system under the Juvenile Code and those of the adult penal system. Moreover, our determination in this case that the juvenile court must control and coordinate all aspects of juvenile treatment in order to carry out its duties under the Juvenile Code, and the determination in *Weinstein II* that control of juvenile court employees is within the inherent power of the juvenile court, require rejection of relators' claim that detention and treatment of juveniles is an executive function.

The ouster sought by relators is denied and the writ of quo warranto is quashed. Costs will be assessed against relators.

BARDGETT, C. J., and DONNELLY, SEILER, MORGAN and HIGGINS, JJ., concur.

RENDLEN, J., concurs in result.

